286 So.2d 876

**Clifton Wayne BARNETT**

v.

**STATE.**

8 Div. 237.

Court of Criminal Appeals of Alabama.

Aug. 14, 1973.

Rehearing Denied Oct. 30, 1973.

Tarter & Wininger, Birmingham, for appellant.

William J. Baxley, Atty. Gen., and Myron H. Thompson, Asst. Atty. Gen., for the State.

HARRIS, Judge.

A wife and mother is dead at twenty-nine, having been shot three times with a twenty-two caliber pistol. The husband and father received a life sentence for murder at the age of thirty-seven. He lives with a bullet embedded in his brain.

Appellant, Clifton Wayne Barnett, and Betty Jane Shaw were intermarried in the late 1950s. To this union were born two girls, Vicki Jane and Mary Jo, who were twelve and ten years of age, respectively, at the time of their mother's death on October 10, 1969. A long time ago someone said that well placed domestic affection grows brighter day by day as husband and wife climb the hill of life to sleep together at its foot. Whether this is true or not, it had no application in the case of Clifton and Betty Jane, assuming it was well placed in the beginning of their nuptial relationship. Their marriage turned out to be a most unfortunate one. The daily sky over their lives was overcast with the angry frown of the tempest culminating in quarrels and fights, recriminations heaped upon recriminations, separations and reconciliations, threats of death, attempts to kill, and then death. Such is the record now before this court—a stark human tragedy.

In February, 1969, Betty Jane got a divorce from Clifton on the ground of cruelty. She was awarded permanent custody of the children with reasonable visitation privileges given appellant. In the separation agreement signed by both parties and ratified by the court as an integral part of the decree, the visitation rights were conditioned upon appellant being sober or not under the influence of intoxicating liquors. The property rights of the parties were settled in this proceeding. Betty Jane received $3,000.00 and a Ford automobile. Child support was fixed at $20.00 per week to be paid directly to the mother. Betty Jane deeded to appellant all her right, title and interest to the family home and all household furniture and furnishings located therein.

Immediately after the divorce decree was signed, appellant left for a visit to Ohio and was gone for one week. Upon his return Betty Jane and the girls moved back in the home of appellant and he and she lived together without benefit of clergy until one week before she died from three twenty-two caliber pistol bullets pumped into her head and neck.

It is, perhaps, not necessary to pass on the marital status of the parties at the time of Betty Jane's death, but inasmuch as she was constantly referred to as appellant's "ex-wife" throughout the record, and in order to remove the slightest stigma or reflection upon the moral character of the deceased, and for the benefit of the two young girls and their future standing in the community, we will settle that issue here and now. It is the common law of Alabama that when a man takes a woman into his home and they cohabit together as husband and wife with the present intention of being husband and wife, and where the man holds her out to the whole world as his wife, treats her and regards her as his wife, and where the community looks upon them as husband and wife, and where there was the present intention to marry followed by cohabitation or the open mutual assumption of marital duties and obligations, then they are husband and wife the same as if they had gone through a ceremonial marriage, assuming there was no impediment to contracting a valid marriage. Otherwise there would be only a meretricious relationship which could never ripen into a common law marriage. Her immediate family did not learn about the divorce decree until the last week of her life. On the record before us, we hold that Betty Jane was lawfully married to appellant on the date of her death.

Appellant was indicted for the murder of Betty Jane. On the occasion of the shooting of Betty Jane, appellant, himself, suffered the entrance of a like caliber bullet between his eyes that penetrated a part of his brain and came to rest near the back of his skull. Betty Jane was found in bed fully clothed, without shoes, with a twenty-two caliber pistol cradled in one arm. It was the state's theory, not without considerable substance, that appellant killed her in the back yard of his home, carried her in the house, placed her on the bed and then shot himself. According to appellant, Betty Jane shot him first and he has no recollection of what happened after he was shot, nor who killed her, nor how she got in bed.

Betty Jane owned and operated a beauty shop on a part-time basis, which was located in the rear of the family home. This is mentioned here as it plays a part in the events leading up to the shooting as will be hereinafter mentioned.

During the weekend preceding the shooting on Friday morning, October 10, 1969, Betty Jane and appellant engaged in a difficulty of great magnitude causing her and the two girls to take refuge behind a locked bedroom door in appellant's home. According to the testimony of Vicki, the oldest daughter, her father, appellant, was in the livingroom and she heard him threaten to kill her mother; that he shot through the bedroom door where they were closeted more than once and that her mother returned the fire one time but she shot downward through the door leading into the livingroom. Appellant testified she shot through the door four times. Following this shooting, appellant started knocking on the bedroom door with a hammer. He knocked a big hole in the door and broke the lock. When the door flew open, Betty Jane and the two girls ran out of the house and went to the home of a neighbor nearby and hid in a bedroom closet. Appellant went to this house looking for them and notwithstanding the neighbor told him

they were not in the house he searched every room trying to locate them. He even opened the closet door in which they were hiding, but due to the darkness he could not see them.

Betty Jane called the Sheriff's Department and two deputies were dispatched to the scene so that she could return to the home and get some clothes for her and the girls and go to the home of her sister in Florence. These two officers took the girls in their car and drove in the driveway of appellant's home and Betty Jane walked back. These officers observed her go in the house and a few minutes later she and appellant appeared on the porch. Appellant had her by the hair of her head and had her head under his left arm and was striking severe blows in her midsection or chest. She managed to get loose and went back in the house. In a few minutes she came out with a few items of clothing and got in the officers' car who carried her and the girls to her sister, Mrs. Christine Price, where she stayed until the following Friday when she was shot.

On Monday morning, October 6, 1969, she swore out a warrant charging appellant with assault and battery. This warrant was executed by placing appellant in jail where he remained overnight. On the way to jail appellant threatened to kill Betty Jane. According to the testimony of Deputy Sheriff James Camp, appellant said, "couldn't no damn woman have him arrested and put in jail and get by with it; said he was going to kill her."

Monday night while appellant was in jail, Betty Jane and her sister, Christine, and two deputies, one of whom was Bill Price, husband of Christine, went to appellant's home to get more clothing for herself and the girls. She also got a twenty-two caliber pistol, a twenty-two long rifle, and other items of personal property, together with the Ford automobile. This automobile remained at the Price home from then until several weeks after Betty

Jane's death when it was placed on a used car lot for sale and was sold. Appellant claimed that on Saturday afternoon previous to his arrest for assault and battery, he was using this Ford automobile to carry one Charlie Brown to look at a tractor; that he stopped by his home to pick up a package of cigarettes and that Betty Jane did not want him to leave the house, called him an S.O.B. and told him if he left, she would kill him. He said he went to the car followed by her and as he was driving off, he heard two shots, one shot struck the rear quarter panel of the car and glanced off; that when he got to Charlie Brown's house, both of them observed the bullet hole. As against this, Christine testified that she inspected the car and did not observe a bullet hole, and Mr. Underwood, who sold the car, said he thoroughly inspected the car and there were no bullet holes in it.

On Thursday night, before her death on Friday, appellant called Mrs. Price and gave her a message to deliver to Betty Jane. He told Mrs. Price to tell Betty Jane that he was leaving $20.00 (support money) between the storm door and other door at the beauty shop and for her to pick it up the next morning after she carried the children to school and to leave him a receipt for the money; that he was leaving town and would not be back until the following Tuesday. Mrs. Price told appellant that Betty Jane had a box at the town of Killen and for him to mail the $20.00 to her. Appellant protested that he didn't have a stamp and that he didn't want to go to all that trouble. Mrs. Price then told him she would deliver the message.

Friday morning Betty Jane got the children ready for school and told Mrs. Price that she was going to come back by the beauty shop and pick up the $20.00 and she should be back before eleven o'clock. While they were eating breakfast that morning, Mrs. Price's husband offered to lend Betty Jane a pistol to carry with her but she refused the offer. When she did

not return, Mrs. Price became apprehensive and called her husband at the Sheriff's Office and reported that Betty Jane had not returned home. Time passed and she made one or two more calls to the Sheriff's Office. Finally, at one-thirty she called her husband and requested him to go to appellant's home and see if he could find her.

Deputy Bill Price asked Deputy James Camp to go with him to appellant's home in search for Betty Jane. Upon arrival Price blew the horn and no one came to the door. He saw an Oldsmobile parked in the driveway that belonged to Betty Jane's mother but which was being used by Betty Jane while her mother was in the hospital. He left Camp in the car and went into the house alone. On entering the front door, he saw appellant in front of the bathroom door which was adjacent to a bedroom. He had on a tee shirt and shorts and was barefooted. He was mopping up blood. Price asked him where was Betty Jane and he replied, "back there." Price walked to the bedroom door and saw Betty Jane lying on the bed with a bloody towel over her face and a pistol cradled in her arm and blood everywhere. He came back to appellant and said, "You killed her didn't you?". Appellant replied, "You G.D. right I killed her." Price went out on the porch and motioned Camp to come in. When Camp got to the porch Price told him she was dead. Price went to the car to radio the Sheriff's Department to send more help. He then returned to the house but stayed inside only a minute or two as he became ill and had to get out of the house. Price did not hear any of the conversation between Camp and the appellant. As soon as the Chief Deputy Sheriff and other officers arrived, Price left and went home to tell his wife.

Camp testified that when he entered the house, he saw appellant standing by a puddle of blood with a mop in his hand. He observed that he had been shot in the forehead. Camp asked him what happened and

appellant said, "I killed the hell out of her." At the time appellant made this statement, Camp had not seen the body of Betty Jane. He later saw and examined the body on the bed. When other officers arrived, Camp was discussing things with them and said, "I wonder how many times or where she was shot." This inquiry was not made to appellant but was overheard by him, whereupon he stated that she was shot three times and showed them where she was shot in the head.

From the record:

"MR. TATE:

"Q. How did he say he would show you? Did he go over and point out on her?

"A. No, he said, 'I can tell you how many times she was shot; she was shot three times—once along here, once along here and once along here'.

"Q. Where were you at that time?

"A. I was just about in the door facing the bathroom and the hall going to the bedroom where she was at.

"Q. And where was he?

"A. He was a few feet toward the front door from me sitting in a chair.

"Q. Other than your asking him what happened when you first walked in the house, did you ever ask him anything else?

"A. I did not.

"Q. Did he say anything else after he told you where the bullets entered?

"A. He said, 'That killed her and if it hadn't—'

"THE DEFENDANT OBJECTS TO THAT ON THE GROUNDS IT IS IL-LEGAL, IRRELEVANT, INCOMPE-TENT, IMMATERIAL AND THE PROPER PREDICATE HAS NOT BEEN LAID.

"THE COURT: LET ME ASK THE WITNESS A QUESTION. MR. CAMP, DID WHATEVER ELSE HE SAID, WAS IT SAID WHILE HE WAS SITTING IN THE CHAIR AND NOT IN RESPONSE TO ANY QUES-TION THAT YOU ALL WERE ASKING?

"WITNESS: YES, IT WAS A CON-TINUED CONVERSATION.

"THE DEFENDANT OBJECTS TO THE FACT THAT IT WAS A CON-TINUED CONVERSATION BE-CAUSE THAT IS A CONCLUSION.

"THE COURT: THE COURT OVER-RULES THAT OBJECTION AND OVERRULES THE OTHER OBJEC-TION TO THE WITNESS' TESTI-MONY IN ANSWER TO THE QUES-TION BY MR. TATE.

"MR. HOLT: THE DEFENDANT EXCEPTS SEPARATELY AND SEV-ERALLY TO EACH OF THE RUL-INGS.

"THE COURT: I DON'T KNOW WHETHER THE WITNESS AN-SWERED FULLY BECAUSE THE OBJECTION WAS MADE IN THE MIDDLE OF THE ANSWER. DID HE OR NOT?

"MR. W. A. BARNETT: HE START-ED ANSWERING SO QUICK WE HAD TO OBJECT WHILE HE WAS ANSWERING.

"THE COURT: GO AHEAD, MR. TATE.

"MR. TATE:

"Q. Do you mean he said this statement about how many times he shot her—

"MR. HOLT: THE DEFENDANT OBJECTS TO HIS REPHRASING THE QUESTION. WE WOULD LIKE FOR THE COURT REPORTER

TO READ THE QUESTION. WE WOULD LIKE FOR THE RECORD TO SHOW THAT THE OBJECTION WAS TIMELY INTERPOSED AND LET THE OBJECTION COME AHEAD OF THE ANSWER.

"THE COURT: THAT REQUEST IS GRANTED, LET THE OBJECTION COME BEFORE THE ANSWER. WILL YOU READ THE LAST QUESTION BY THE DISTRICT ATTORNEY AND THE ANSWER.

"QUESTION READ: Did he say anything else after he told you where the bullets entered: Answer: He said, 'That killed her and if it hadn't—'

"MR. TATE:

"Q. Answer the question?

"THE DEFENDANT OBJECTS ON THE GROUNDS IT IS ILLEGAL, IRRELEVANT, INCOMPETENT, IMMATERIAL AND THE PROPER PREDICATE HAS NOT BEEN LAID. OBJECTION OVERRULED. DEFENDANT EXCEPTS.

"A. He said that the three shots killed her and if it hadn't he would have shot her again."

It is to be noted here that the statements made by appellant were made during an investigative stage of this case. The statements, in the main, were spontaneous outbursts on the part of appellant. He had not been accused of murder and he was not under arrest. These statements were voluntary in every sense of the word.

Mr. C. V. Beasley, Chief Deputy Sheriff of Lauderdale County, arrived in company with two other deputies and took over the investigation. He immediately gave appellant the *Miranda* warnings and his constitutional rights. He specifically asked him if he understood these rights and appellant replied that he did. Beasley then asked him if he wanted to give a statement and he said he did. At this point in time, appelllant talked coherently, his speech was normal and he appeared to be alert. His statement as related by this witness is,

"He said his wife arrived between the hours of nine and ten, a. m. He said he intended to kill her. He said he had a pistol in his hand. He said that she snatched the gun from his hand and shot him in the head. He said that he took the gun away from her, chased her out in the yard, got her down on the ground and shot her three times in the head. He said that he brought her back in the house and put her on the bed."

The testimony revealed there was a place in the back yard where the soil and grass appeared to be disturbed and near which were several spent shells. The victim's dress appeared to have some dirt on it around the waist. Other spent shells were found near the back-door steps and in the livingroom. The officers did not find any sign of blood in the yard. The pistol cradled in the victim's arm was fully loaded with the exception of one spent shell.

Appellant was carried by ambulance to the emergency room of a local hospital where a craniotomy was performed with the removal of dead brain tissue, blood clots, bone fragments, small pieces of lead, dirt and hair. The bullet was not removed. He sustained some brain damage and this will be permanent. He was discharged from the hospital on October 31, 1969.

Following an inquisition with a six-man jury in the Probate Court of Lauderdale County on February 16, 1970, appellant was declared to be of unsound mind and a brother was appointed his guardian. He was committed to Bryce Hospital on October 31, 1969, and discharged from this hospital on April 18, 1971. He was recommitted to Bryce Hospital where he remained for several more months.

He was indicted for murder in the first degree and was first arraigned on June 11, 1971, when he pleaded not guilty, and not guilty by reason of insanity and his trial

was set for July 12, 1971. On that date one of his retained counsel was ill and his other lawyer was engaged in the Federal court, and the case was continued. He was put to trial on September 20, 1971, on his pleas of not guilty and not guilty by reason of insanity. The jury could not reach a verdict and a mistrial was declared and entered of record. Prior to the September trial, appellant filed a motion for inquisition by a jury to determine his present sanity and ability to undergo a trial. After an evidentiary hearing, this motion was overruled and denied.

On December 6, 1971, appellant was again arraigned and entered only the plea of not guilty. In open court on this date, he refiled his motion for an inquisition by a jury to determine if he was presently sane and had the ability to undergo trial which motion was denied by the court. A special venire was waived and the case proceeded to trial and on December 10, 1971, the jury returned a verdict convicting appellant of murder in the first degree and fixed his punishment at life imprisonment.

Appellant testified in his behalf stating that the deceased came to his home on Friday morning around eight thirty while he was in the bathroom shaving. She knocked on a bedroom window and he went to the back door and invited her in the house. He said she refused to enter the house and told him to come outside as she wanted to discuss a nervous problem that Mary Jo, the youngest daugher, was having. He further stated that she was within a foot and a half from him with both hands in her coat pockets. (In the September trial he testified she was seven or eight feet out in the back yard when he was shot.) He testified that his attention was attracted to the beauty shop by a door slamming and he saw someone's hand or arm; that as he turned back he caught a glimpse of something shiny in the hands of the deceased and he was immediately shot by her. He claims that he cannot remember anything from the time he was shot

until he came to three weeks later in the hospital. He had no recollection of any of the events testified to by the law officers who conducted the investigation. He did not even remember them coming to his home much less making any statements to them concerning the death of Betty Jane.

Prior to trial on December 6, 1971, appellant filed a motion to suppress from the evidence any purported statement, confession, admission of guilt or other type oral comment, statement or exclamation made by appellant at any time after the alleged homicide, and prior to his release from the hospital on the following grounds:

"1. For that said Defendant at the time of any alleged confession, admission of guilt, or other type statement of an incriminating nature was severly (sic) injured, suffering from a gunshot wound through and into his brain, and in no condition to comprehend or understand the nature or implication of any such statement made by him.

"2. For that at the time of any such statement, if any, the Defendant was in the custody of officers, who had previously accused him of committing a murder, and that he was not informed of his constitutional rights.

"3. For that because of the physical and mental condition that the Defendant was in at the time of any such statement he could not have understood or comprehended the nature or implication of such statement, or have understood or known in fact what he was aying (sic), and was in fact only repeating suggesions (sic) made to him by investigating officers."

Considerable evidence, including the testimony of the first trial, was introduced in support of the motion to suppress after which the court overruled the motion.

Mr. Van Pruitt, Assistant State Toxicologist, performed a post-mortem examination on the body of the deceased the day after she was killed. He observed certain injuries on the body: "Number one being

a hole located above and in line with the left ear canal, number two a similar hole which was located over the left ear canal level and somewhat backward, and then number three a hole which was located in the left side of the neck and somewhat back of the midline or sideline of the neck." He testified that around each hole was powder residue and powder smudges.

He did a cranial examination and removed two lead slugs which in his opinion caused decedent's death. He conducted a firearms examination and comparison and determined that one of the slugs he removed from Mrs. Barnett's head was fired from a twenty-two caliber revolver manufactured by Imperial Metal Products and bearing serial number 117454. The other slug was so damaged and distorted that he was unable to identify the weapon from which it was fired. The particular pistol that fired this slug was the one the officers found on the bed between the left arm and the body of Mrs. Barnett and is identified as State's Exhibit No. 13.

Mr. Arthur Gist, a witness for the state, was shown this same pistol, Exhibit 13, and testified that the pistol belonged to him. Gist and appellant were friends and had been for several years. He said appellant came to his home before five o'clock one morning and borrowed this pistol from him, and that this occurred three to five days before Mrs. Barnett was killed. He further testified that appellant borrowed the same pistol about a month before saying somebody was bothering his family around the house and he wanted a gun until he could find one to buy. The first time he borrowed it, he kept it a week before he returned it.

During their investigation, the sheriff's deputies found a receipt for $20.00 allegedly signed by appellant. It was found in the room where the body was discovered. On the back of this receipt was a message to the children supposedly written by appellant. The receipt went missing though it was last observed in possession of the Sheriff's Office in the County Courthouse. The trial court would not permit any witness to state what the message was since the identity of the handwriting could not be ascribed to appellant. This was not the only item of evidence that was lost or destroyed. Seven or eight spent cartridges found in the backyard were last seen on the desk of the chief deputy sheriff. They were in a sack to be put under lock and key and preserved for trial. The chief deputy left his office for fifteen minutes and when he returned the sack containing the spent shells was gone. The bedroom door containing bullet holes in both directions was unhinged and found in another room of the house. It, too, went missing. No photographs showing the entrances and exits of the bullet holes were made by the investigating officers. All bloodstained bed linen and clothing were destroyed by the officers at the request of a sister of deceased. The death weapon was the only tangible evidence preserved as evidence by the officers and this was not checked and examined for fingerprints. The laxity attending the investigation and handling of this case cannot merit commendations as "good police work". As a matter of fact it is anything but good police work.

We are pressed for a reversal on many and sundry grounds and we will respond to these insistences of error.

■ No error intervened in the action of the trial court in overruling the motion for an inquisition by a preliminary jury to determine the sanity vel non of appellant's present situation and his ability to undergo a trial and his competency to cooperate with, aid and assist his counsel in the preparation and trial of his case. This is a matter that addresses itself to the sound discretion of the trial court and its ruling is not reviewable on appeal, absent evidence tending to show an abuse of discretion. Seibold v. State, 287 Ala. 549, 253 So.2d 302; Pace v. State, 284 Ala. 585, 226 So.2d 645; Wheeler v. State, 47 Ala.App.

457, 256 So.2d 197; Minniefield v. State, 47 Ala.App. 699, 260 So.2d 607.

In Pace v. State, supra, the rule is succinctly stated as follows:

" * * * The legislature has not given a right to a defendant to receive a mental examination whenever he requests one. Absent such a right, machinery for screening requests must exist. The legislature has made the trial court this screening agent. We cannot say under our past cases that the appellant's showing was so compelling that the trial court abused its discretion in denying this petition. The trial court held a hearing, listened to the witnesses and made a decision. It might have decided either way on the question of whether the hearing produced any real evidence of legal insanity or legal incompetence. Its decision was not arbitrary or unsupported by reason or fact. We conclude that the trial court did not abuse its discretion."

As above stated, when appellant was put to trial the second time on December 6, 1969, the special plea of not guilty by reason of insanity was not interposed as a defense to the charge laid in the indictment. Nevertheless, appellant refiled his motion for inquisition by jury to determine his competency to stand trial.

From the record:

"PROCEEDINGS IN THE CONFERENCE ROOM IN THE PRESENCE OF THE DEFENDANT AND OUTSIDE OF HEARING OF THE VENIRE OF JURORS DRAWN TO SERVE FOR THE WEEK

"MR. DONALD E. HOLT:

"The Defendant moves to refile the Motion for Inquisition by Jury to determine the mental competency of the Defendant, Clifton Wayne Barnett, to stand trial in this cause, and in support of said motion the Defendant offers the testimony submitted on the previous hearing of the motion on September 14, 1971.

"THE COURT:

"Let the record show that all motions and testimony as regards the Motion for Inquisition by Jury are refiled and by agreement of the parties if a transcript is made up in this cause for purposes of appeal, the Court Reporter will copy into the transcript all matters pertaining to the Motion for Inquisition, including all testimony given on the original Motion by the State and the Defendant, and the parties stipulate that if the evidence were reheard this morning that it would be the same as previously submitted on the previous motion.

The only evidence offered by appellant in support of this motion was the testimony of Dr. John D. Nofzinger, the neurosurgeon, who performed the craniotomy on appellant the day he was shot or the day he shot himself. The neurosurgeon testified that appellant suffered some brain damage and that this was a permanent condition. This witness was explicit that he was a neurologist and not a psychiatrist and as such he did not feel that he was qualified to express an opinion on the competency of appellant to stand trial.

In addition to this testimony, appellant offered in evidence the hospital records of the Eliza Coffee Memorial Hospital showing his admissions there from October 10 to October 31, 1969, and from April 5 to April 11, 1970, and from February 2 to February 4, 1971, and from May 3 to May 4, 1971.

In addition to the medical records above, appellant introduced the entire probate file showing the lunacy proceedings wherein there was a jury verdict finding him to be of unsound mind leading to his commitment to Bryce Hospital.

From the medical records covering his first period of confinement, we take the following:

"The patient's history is that he was shot in the forehead by his wife and his wife then killed herself. He was brought into

the emergency room with an obvious gunshot wound of the head. He is not unconscious, he is oriented in all three spheres, stating that he was shot Monday, however, four days ago. In spite of this he is oriented in all three spheres, moves all four extremities on command, optic fundi are clear.

\*　　\*　　\*　　\*　　\*　　\*

"In considering the spread of the powder burns on the skin of the scalp and forehead in addition to the small circular hole and some powder burns within the margin of the wound of the skin, it would appear that the weapon was approximately six to twelve inches away from the site of entry when discharged. The wound is consistent with a small caliber bullet such as a 22."

On admission on April 5, 1970, the history was stated to be:

"The patient is admitted to the hospital for acrylic cranioplasty.

"The patient was previously admitted to Coffee Hospital on 10–10–69, after having sustained a gunshot wound to the head. He was taken to surgery on 10–10–69 at which time a frontal osteoplasty craniotomy with debridement and irrigation of the gunshot wound to the brain with transcortical, subcortical wound was done. Post-operatively he showed minimal symptoms suggestive of organic brain syndrome and was referred to a psychiatric situation where he was evaluated and treated at Bryce Hospital. Since that time he has apparently done well to the point where he was released to the custodial care of his brother. He has complained somewhat of headaches and pain surrounding the entrance wound of the bullet, specifically in the mid frontal area. He is now admitted for cranioplasty." [1]

Discharge Summary:

"A 53(35) year old male admitted to the hospital on 4–5–70 and discharged on 4–11–70. The patient has a cranial vault defect, secondary gunshot wound to frontal area. He was taken to surgery where under general anesthesia an acrylic cranioplasty was done on 4–6–70. His post-operative course was uneventful. He was discharged, to be followed in the office."

On admission on February 2, 1971, appellant's medical records show the following:

"Chief Complaint: Seizures.

"This man was admitted through the emergency room from the city jail. He apparently has been under heavy alcoholic influence and had some kind of spell in the jail and fell and struck his head. When he was seen in the emergency room, he had two isolated grand mal seizures and was felt at that time to be in status epileptosis. I operated on this man on 4–6–70 for a transcortical gunshot wound. He was supposed to have been taking Dilantin and Phenobarbital as an anti-convulsant, although I have lost tract of him for follow-up. It is my understanding that he has been drinking excessively and has had several seizures since I last saw him in my office."

Admitting Diagnosis:

"Grand mal seizures, status epileptosis secondary to transcortical gunshot wound to the head and also secondary alcoholic intoxication."

The hospital admission for May 3, 1971, was for a scalp laceration.

Discharge Summary:

"The patient was admitted in a state of intoxication with lacerated scalp. For description of which see emergency room record. (Auto accident: Laceration to back of head. Sutured.) At his brother's request he was kept overnight for observation because he stated that the last time he had a similar injury, he had

1. The surgical correction of skull defects.

convulsions after they took him home. He had no convulsions at this time. He is dismissed to the care of his brother, who is to return him to Bryce's hospital from which he is out on leave."

The state introduced the testimony of several of the sheriff's deputies and jailers who had known appellant for some time and who had come in contact with him while in jail. It was their testimonies that he appeared to be normal in every way; that he talked rationally and appeared to be as normal as he was before he was shot.

The state also introduced the Order of Commitment to Bryce Hospital by the Judge of Probate of Lauderdale County as well as the letter from Bryce's notifying the Probate Judge that appellant was discharged from this institution on April 18, 1971. The letter is as follows:

"State of Alabama
DEPARTMENT OF MENTAL HEALTH
BRYCE HOSPITAL
Tuscaloosa, Alabama   35401

"Stonewall B. Stickney, M.D.                          George C. Wallace
Commissioner of Mental Health                    Governor

"May 3, 1971

"Honorable Estes R. Flynt
Judge of Probate
Lauderdale County
Florence, Alabama   35630

"Barnett, Clifton Wayne
Our File 02 84 35

"Dear Sir:

"Mr. Clifton Wayne Barnett, committed from your county on October 31, 1969, was discharged from Bryce Hospital on April 18, 1971. It was the opinion of the ward physician that adequate study had been made and that there was no evidence of the existence of mental illness at this time.

"Should evidence of mental illness (psychosis) occur in the future, any return to Bryce Hospital will require new application and new commitment, as was done in the first instance.

"Sincerely yours,

"s/William D. Monroe, M.D.
   William D. Monroe, Sr., M.D.
   Staff Psychiatrist

"WDM/mpf
   cc:  Mr. Johnnie P. Barnett
         201 South Spurr Street
         Florence, Alabama   35630"

---

The certificate of the Probate Court committing appellant to Bryce Hospital is of no probative value in determining his legal responsibility for criminal acts. As the Court of Appeals, speaking through Judge Harwood (now Justice Harwood) said in Grissom v. State, 33 Ala. App. 23, 30 So.2d 19:

"Section 210, Title 45, Code of Alabama 1940, sets out the procedure in the Pro-

bate Court for obtaining a certificate from such court for the admission of a patient to a State insane hospital. The certificate of the court merely certifies that it has been satisfactorily shown to the court that the patient is so defective mentally that he or she ought to be committed to the hospital for insane persons for safekeeping and treatment."

Appellant testified during his first trial presided over by the same judge when he was tried and convicted in December 1971. We have read his testimony on both trials. His testimony reveals a marked degree of clarity and he withstood a close and searching cross-examination. His testimony does not indicate any mental aberrations. His testimony on the last trial substantially "pig tracked" that given at the first trial with one notable exception. In the September trial he stated that the deceased was seven or eight feet out in the yard when he was shot and at the December trial, he put her about a foot and a half from him. The change of testimony could well stem from his knowledge about the powder residue surrounding the bullet entrance wound suffered by him as testified to by the neurosurgeon during both trials. The distance of seven or eight feet was just too far away to leave powder burns or residue from the firing of a twenty-two caliber pistol.

Upon a consideration of the totality of facts and circumstances of this case, we are not impressed with appellant's assertion that there were reasonable grounds to doubt his sanity to stand trial or that he was mentally incompetent to aid and assist his counsel in the trial of the case.

■ Appellant claims reversible error because the trial court failed to order the drawing of a special venire, or to secure a waiver from appellant. There are four answers to this contention: (1) The record reflects a waiver by appellant, (2) the state specifically waived the death penalty at a time it could legally have been imposed, (3) there is a waiver of a special venire when that issue is not raised before the trial is begun, and (4) Act No. 967, General Acts 1971, page 1724, approved September 7, 1971, abolished the drawing of special venires in the Eleventh Judicial Circuit of Alabama (Lauderdale County). Anyone of the above enumerated grounds serves to dispose of appellant's claim of error. Waldrop v. State, 185 Ala. 20, 64 So. 80; Davis v. State, 229 Ala. 674, 159 So. 209; Welch v. State, 278 Ala. 177, 176 So.2d 872.

■ There was no error in overruling and denying appellant's motion to suppress his confession on the grounds hereinabove set forth.

In Goldin v. State, 271 Ala. 678, 127 So. 2d 375, the Supreme Court said:

"The fact that an accused is not in full possession of his or her mental faculties when the confession is made does not render it inadmissible, but only affects the weight to be accorded by the jury; or is provable merely to support other evidence that the confession was not voluntary. To render such a confession inadmissible on that ground the mania must have been such that the accused was either an idiot or a lunatic during lunacy. Redwine v. State, 258 Ala. 196, 61 So.2d 724."

More recently in Elrod v. State, 281 Ala. 331, 202 So.2d 539, the Supreme Court through Mr. Justice Merrill wrote:

"We have said that a 'person may be partially insane and still be competent to testify or make a confession.' The [sic] involves an inquiry into his appearance, demeanor and the nature of his statements. It is for the court to determine whether he has or had the requisite intelligence and ability to communicate his responses to questions. * * *"

The first two deputies to arrive at the murder scene merely asked appellant, "What happened?". They were only investigating the disappearance of the de-

ceased or were trying to locate her as she failed to return to the house of her sister at the hour she said she would be back. They were not investigating a crime for the simple reason they did not know that a crime had been committed. They did not take appellant into custody nor conduct a "custodial interrogation". Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed. 2d 694, has no application to this case at this point in the investigation. An Alabama case squarely in point on this issue is Truex v. State, 282 Ala. 191, 210 So.2d 424.

When the chief deputy arrived and it was made known to him that Betty Jane was dead, he immediately gave appellant the *Miranda* rights and warnings after which he voluntarily made the statement quoted herein. Appellant was then sent to the hospital where he remained three weeks before being transferred to Bryce Hospital.

The trial court conducted a pre-trial evidentiary hearing on the motion to suppress the alleged confession made by appellant in the livingroom of his home next to the bedroom where his wife lay dead, which covered over two hundred (200) pages of the transcript. This hearing took place outside the presence of the jury venire and before the jury was struck to try the case. The record shows the following:

"THE STATE RESTS ON THE MOTION TO SUPPRESS.

"THE DEFENDANT RESTS ON THE MOTION TO SUPPRESS.

"THIS WAS ALL THE TESTIMONY OFFERED ON THE MOTION TO SUPPRESS.

"THE COURT: THE DEFENDANT'S MOTION TO SUPPRESS THE EVIDENCE REGARDING A CONFESSION OR INCRIMINATING STATEMENTS OF THE DEFENDANT, MR. BARNETT, IS OVERRULED ON THIS TRIAL TODAY (DECEMBER 6, 1971).

"THE DEFENDANT EXCEPTS TO THE RULING OF THE COURT.

"THE COURT: Now, we will go into the Courtroom and get ready to strike the Jury in this case."

There was a full compliance with *Miranda*, and our cases as well, and there was no error in admitting appellant's statement in evidence. Goldin v. State, supra; Lokos v. State, 278 Ala. 586, 179 So.2d 714; Myhand v. State, 259 Ala. 415, 66 So.2d 544.

During the trial some question was raised concerning lost savings bonds. The deceased's sister, Christine Price, Administratrix of her estate claimed possession of the bonds. Counsel for appellant made a motion for the production of the bonds and the court sustained an objection, saying:

"We are trying a case of homicide against the defendant—not whether somebody in a family of the deceased wife and two children on one side having gotten the bonds—what we are here about today is to try a homicide case and to determine whether or not the defendant is guilty or not guilty."

■■ Appellant did not object to this statement and made no motion to exclude same. Nothing is presented for review in this instance. Felton v. State, 47 Ala.App. 182, 252 So.2d 108; Greathouse v. State, 47 Ala.App. 71, 250 So.2d 609; Thompson v. State, 44 Ala.App. 414, 211 So.2d 505. Besides, we do not think the statement was objectionable in the first place.

■ There was no error in admitting into evidence the pistols and the spent and unspent cartridges. Shiflett v. State, 265 Ala. 652, 93 So.2d 526; Payne v. State, 261 Ala. 397, 74 So.2d 630; Lackey v. State, 41 Ala.App. 46, 123 So.2d 186.

■ Neither was there error in the admission of photographs of the body of the deceased lying in bed, and the *locus in quo* depicting the scene of the crime. Smarr v. State, 260 Ala. 30, 68 So.2d 6; Hines v.

State, 260 Ala. 668, 72 So.2d 296; Nichols v. State, 267 Ala. 217, 100 So.2d 750; Mitchell v. State, 43 Ala.App. 427, 191 So. 2d 385.

Appellant also claims the trial court erred in its oral charge to the jury. There were no exceptions reserved to any part of the oral instructions and, therefore, we cannot review this claim of error. This principle is too well settled for citation of authority. Moreover, we do not agree that the oral charge was in anywise erroneous.

We have carefully searched the record for errors affecting the substantial rights of appellant and have found none and this case is due to be, and is affirmed.

Affirmed.

ALMON and DeCARLO, JJ., concur.

CATES, P. J., concurs in result.

TYSON, J., not sitting.