318 So.2d 364

**Allen Andrew LAMBERT**

v.

**STATE.**

**7 Div. 360.**

Court of Criminal Appeals of Alabama.

Aug. 19, 1975.

Dixon, Wooten, Boyett & McCrary, and Clark Carpenter, Talladega, for appellant.

William J. Baxley, Atty. Gen., and William A. Golinsky, Asst. Atty. Gen., for the State.

HARRIS, Judge.

Appellant was convicted of robbery and sentenced to thirty years in the penitentiary. He was represented at arraignment by one attorney and at trial by retained counsel. He pleaded not guilty. After conviction he gave notice of appeal. He was found to be indigent and a free transcript was furnished him and trial counsel represents him on this appeal.

The evidence in this case is all one way and rests on the state's testimony alone. Appellant did not testify nor did he adduce any testimony in his behalf. The state's testimony was strong and overwhelming pointing to the guilt of appellant.

Appellant, Russell Hood, Ernest Wimpee and Sandra Shaneyfelt left Gadsden on the afternoon of July 16, 1974, to go to Talladega and rob a beer store and carry the beer back to Gadsden and sell it. Sandra was driving Hood's car and Hood rode in the front seat with her. Appellant and

Wimpee rode in the rear seat. Sandra did not have a driver's license. Wimpee was living with a woman by the name of Brenda Gilley and he borrowed her driver's license and gave it to Sandra. Before leaving Gadsden Hood borrowed a double-barrel sawed-off shotgun and a 357 Magnum pistol and put them under the back seat of the car.

When they arrived in Talladega, they found the beer store closed. They rode around the streets of Talladega discussing what place they were going to "hit." Sandra pulled to the side rear of the A & P store located on East Street and parked the car. Hood got out of the car and entered the store to buy some cigarettes. He returned to the car in a few minutes and said it looked like a good place to him. Hood got the sawed-off shotgun and appellant got the 357 Magnum and they entered the store followed by Wimpee. The time was 6:50 p. m. and the store was in the process of closing for the night.

As the trio entered the store they met Mr. Randall Hunt at the front door. Hunt was leaving the store for the night. Hood pointed the shotgun at Hunt and told him to back up inside the door. Hunt asked him what he was doing and Hood told him again to back up and as he was backing, Hood punched Hunt in his chest with the shotgun causing him to fall over a screen divider near the door. This fall caused a loud noise which attracted the attention of the other employees in the store and they looked toward the front door and saw the man with the sawed-off shotgun.

From the record:

"A. He told me to get up and I got up and was calling for Mr. Hare, the manager of the store and I couldn't get anyone's attention. And I got up and leaned up against Register Number two, the end of it, and he called out that 'this is a robbery.' And from that point he directed me to Register Number two and told me to open it and get the money out."

Hunt removed all the money from the register, totaling $44.00, put it in a sack and handed the sack to Hood. Hunt further testified that after Hood got the money from him at the second cash register, he pulled the shotgun on Miss Joye Hurst, the cashier at cash register number one, and made her empty that cash register and put it in a sack. During this time Mr. Hunt glanced at the office and saw a man in the office with Mr. Willard Baker, the Assistant Manager of the store, but he did not get to observe him long enough to identify him.

Miss Joye Hurst testified that she was operating the number one cash register when a man she subsequently identified as Mr. Hood pointed a sawed-off shotgun at her and told her to empty her cash register. She got a brown bag and put all the money she had in her cash register in the bag and handed the bag to Hood. During this time she saw a man with a pistol in his hand enter the office door of the Assistant Manager, Mr. Willard Baker, and saw him pointing the pistol directly at Mr. Baker. She heard the man tell Mr. Baker he wanted all the money. Mr. Baker asked Miss Hurst to hand him a bag. She got a large bag and leaned over the aisle separating her check-out counter from the office and Mr. Baker reached and got the bag from her. She got a good look at the man in the office pointing the pistol at Mr. Baker. After the man got the money from both cashiers and the money from the office, one of the men ordered all employees to lie down on the floor and to stay on the floor for five minutes after they walked out the front door and all employees complied with such order.

Some time later a police detective brought some photographs to the store and asked her to examine the photographs and see if she could identify anyone in the photographs. Miss Hurst identified both Hood and the appellant. She later viewed a lineup at Police Headquarters and again identified Hood and appellant. Miss Hurst also made an in-court identification of ap-

pellant as the robber with the pistol. She said the men were in the store at least five minutes. She further stated she looked at the man with the pistol for at least two minutes. She said he had reddish hair and needed a shave. She thought he had a mustache. She stated he was wearing a light colored shirt and blue jeans. As she was on the floor she watched appellant leave the store and noticed he was bare-footed.

On cross-examination she testified that she was afraid. She was asked the following question and made the following answer:

"Q. And in fact, you were so afraid and so frightened that your identification could be clouded by that excitement could it not?"

"A. No, sir, because something like that, I knew what was going to happen and I thought I might have to identify them and that is why I was staring at the man in the office and I got a picture of his face in my mind."

Perry Swain, another employee of the store, testified that he first saw a man walking back and forth down the aisles of the store. He was wearing a T-shirt and was barefooted and needed a shave. Swain went back into the work room to get some stock. Someone told him the store was being robbed and he went up front to see what was happening. He then saw appellant in the office pointing a pistol at the Assistant Manager. He viewed only the man in the office and said the man needed a shave and had tatoos, and had on a different shirt from the T-shirt he was wearing when he first saw him. He said the shirt was checkered, more like a surf shirt with no sleeves. He further said the man was barefooted.

Some time later the officers brought him some photographs to view and told him they had a man in custody and he told the officers that he would rather look at the man personally. He viewed a lineup of six or more men and identified the appellant as the man with the pistol pointed at the Assistant Manager on the day of the robbery.

From the record:

"Q. I'll ask you this. Independent of that lineup, that is, just ignoring that lineup, do you understand what I mean, just putting that lineup out, can you tell the jury, independent of that lineup that this is the man that you saw in the office on the day the store was robbed?"

"A. Yes, sir."

Mr. O. C. Hare, Manager of the A & P Store was working between the second and third cash registers at the time of the robbery when someone called him to attract his attention. The Assistant Manager in his office also called him. He saw the man at the entrance door with a shotgun and a man standing in the office. He noticed that the man in the office was bare-footed, wore sunglasses and had a heavy facial growth. He was not able to further identify the man in the office. He positively identified Russell Hood as the man with the shotgun.

After the robbery he called in the head cashier or accountant and they went through the office safe and the cash registers and found $3,234.14 missing.

Ernest Wimpee, a co-indictee with appellant, Hood and Sandra Shaneyfelt, was called as a witness for the state. He testified that he had known appellant all of his life. That all of them got together at Russell Hood's trailer on the morning of July 16, 1974, and started drinking beer. They all lived in Gadsden, Alabama. Around four o'clock that afternoon they left Gadsden to go to Talladega to steal beer and take it back to Gadsden and sell it. They found the beer store closed and Sandra drove to the side rear of the A & P Store. He got out and went in the store to get some tomato juice as he had a hangover. While waiting to be checked out, he saw Hood enter the front door with a sawed-off shotgun and saw appellant in the office

of the store pointing a pistol at the man in the office. He saw the man in the office with appellant sacking money. After the robbery they returned to Gadsden where they divided the money.

He further testified that Sandra was living with Russell Hood on the day of the robbery, and that he was living with a woman by the name of Brenda Gilley. Sandra did not have a driver's license and he got Brenda's license and gave it to Sandra. He stated that Hood got the sawed-off shotgun and a 357 Magnum and put them under the back seat of Hood's car just before they left for Talladega. Wimpee further stated that between Anniston and Gadsden they were stopped by a State Trooper for speeding. That Sandra got out of the car and walked back to the Trooper's car and he gave her a ticket for speeding in the name of Brenda Gilley and kept the license as a bond for her to come to court to answer the charge for speeding.

This witness further testified that on Sunday prior to appellant's trial on Wednesday, January 25, 1975, while both he and appellant were in jail, appellant threatened to kill him if he testified against him during his trial. He stated that he had to pass the cell block where appellant was incarcerated and he heard appellant say:

"If I testified, took the stand against him in this trial, that he would see that once we got to the penitentiary that—uh —that he would like to stand and smile and watch me bleed to death when he stuck a knife in my throat."

On cross-examination Wimpee testified that he had never had a conversation with the District Attorney's office in which any promises were made to him to get him to testify against appellant. That the only conversation he had concerning his testimony was with the investigating officers and they only asked him if he would be willing to testify in the case and no promises of any kind were made to him. He said appellant was not face to face with

him when the threat was made but he knew his voice and he could not be mistaken that appellant threatened to kill him if he testified against him.

Sandra Shaneyfelt was the next witness called by the state. Appellant questioned the competency of this witness to testify and a voir dire examination was conducted out of the hearing and presence of the jury.

Sandra testified that she had been treated by three doctors in Gadsden from April to August, 1974. That she saw these doctors seven or eight times and the diagnosis was "depression." That she had never been sent to a mental institution for treatment. She said she was undergoing emotional distress due to a divorce which caused her to "get real down and have crying jigs." She said, "I was very deeply hurt at the time."

The court asked her, "Do you recall, in your own mind, the events of Tuesday, July 16, 1974, where it is alleged that the A & P Grocery Store in Talladega was robbed?" The witness answered, "Yes, sir." The court then ruled that she was competent to testify but the weight of her testimony would be for the jury's consideration.

In summary, this witness testified before the jury that she was 26 years of age. That she was divorced on July 9, 1974, but had been living with Russell Hood since May of that year. That she had known appellant for about a month and that he often visited the trailer where she lived with Hood and her five children. That after she was arrested and charged with the robbery of the A & P Grocery Store in Talladega, her ex-husband came and got the children.

Her testimony, in the main, corroborated the testimony of Wimpee as to the sawed-off shotgun and the 357 Magnum and the trip to Talladega. That Wimpee gave her Brenda Gilley's driver's license and she drove the automobile to Talladega and parked in the A & P parking lot while

they robbed the store. On the way back to Gadsden Hood asked if it was agreeable to give Sandra $200.00 for driving them and appellant and Wimpee agreed to this amount. Between Anniston and Gadsden they were stopped by a State Trooper. She got out of the car and walked to the Trooper's car and he told her to get in his car. She got in the car and the Trooper asked for her driver's license and she handed him Brenda Gilley's license. The Trooper told her he had clocked her speed at 77 miles per hour and wrote out a ticket for speeding. He told her he would have to keep the driver's license until she came to court to answer the speeding charge.

She further testified that on Monday morning before appellant's trial on Wednesday they were sitting on a bench in the courtroom and appellant threatened her if she testified against him. According to Sandra's testimony, "He told me that if I took the stand and told about it, and testified against him, that when—if he got sent off, that this world wouldn't be big enough for me to hide in because he would get me."

On cross-examination she testified that she had talked to the officers and with the District Attorney and his assistant. She said her last discussion with the District Attorney was on the day she pleaded guilty. That, "He just told me to tell the truth and that is all, nothing more and nothing less, just tell the truth."

From the record:

"Q. In the discussion with the District Attorney, did he tell you that if you would testify in this matter he would recommend ten years and not oppose probation?

A. Yes, sir.

Q. Now, it is all, and everybody is happy.

MR. HOLLINGSWORTH: No, it wasn't if she testified in this matter. If

she pled guilty to the offense. But that's alright.

Q. Well, I am going to object to his telling us what the agreement was.

MR. HOLLINGSWORTH: It is a matter of court record.

Q. Well, what you told her is not a matter of court record.

MR. HOLLINGSWORTH: Well, the matters effecting this record, the jury is entitled to know.

Q. Well, you can bring it out. Now, between April of 1974, and August, 1974—well let's go back. I do want the whole—I want it to be clear to everybody. Let me ask you this. And listen to the question carefully and if it is not right, if it is not what the agreement was, say, no that is not the agreement. Okey/ (sic) Now did the District Attorney tell you that if you would plead guilty that he would recommend ten years and not oppose your probation?

A. Yes, sir, that is what he said.

Q. Alright, now was there any discussion with the District Attorney about your testifying in this matter as opposed to just your pleading guilty?

A. Yes, sir.

Q. There was?

A. Yes, sir.

Q. Now, what was the discussion about your testimony?

A. Just for me to tell the truth.

Q. Were you encouraged to testify?

A. No, it was left strictly up to me.

Q. Were you promised anything if you would testify?

A. Only that they wouldn't oppose probation if I applied.

MR. HOLLINGSWORTH: We would like the record to show that she has a lawyer, Judge and this has been taken up

with her and her lawyer in her lawyer's presence.

Q. Judge, I am not trying to cover up anything as far as the agreement with the District Attorney.

MR. HOLLINGSWORTH: We are not ashamed of anything we did.

Q. If you not in agreement with what she says, then there is really nothing I can do about that."

■ Appellant contends that the trial court erred in allowing Sandra Shaneyfelt to testify because she was not mentally competent. Sandra testified that she suffered severe depression because of her divorce. She was not sent to a mental institution because her doctors did not think it was necessary.

The law is well settled in this state that a witness may be partially insane and still be a competent witness if at the time her testimony is offered she is sane, and it is a question for the court, rather than for the jury, to decide whether she is competent. *Garret v. State,* 268 Ala. 299, 105 So.2d 541; *Elrod v. State,* 281 Ala. 331, 202 So. 2d 539; *United States v. McFarland,* 371 F.2d 701.

The last witness for the state was Mr. Willy Willis, the State Trooper. He stated he had been employed by the Department of Public Safety for more than ten years. That he was in charge of the northern end of Calhoun County, specifically 431 Highway, on July 16, 1974. That while on duty he observed an Oldsmobile 88, about a '65 model on the new four-lane part of Highway 431 between Anniston and Gadsden. His radar machine was on and registered the Oldsmobile going at 77 miles per hour. He turned on his blue light and stopped the car. His report showed it to be 8:05 p. m. He observed four people in the Oldsmobile when he pulled it over. The driver was a female and she got out and walked back to his car and met him at the front fender. At this point in the trial the District Attorney had Sandra Shaneyfelt brought into the courtroom to be viewed by Mr. Willis and she then left the courtroom. Mr. Willis then testified that he recognized her as the lady who was driving the Oldsmobile and the woman who came back to his car. He issued a speeding ticket to her in the name of Brenda Sue Gilley which was the name on the driver's license. He accepted the driver's license as a bond and released her and she got back in the car and drove away.

At the conclusion of the state's case, appellant made a motion to exclude the state's evidence on the ground that a prima facie case had not been proven against the defendant. The court overruled the motion.

■ The evidence adduced by the state was sufficient upon which to base a verdict of guilt. Appellant was viewed by two witnesses at close quarters, for several minutes, in the face without disguise, during daylight hours, and the in-court identification was positive and unequivocal. *Rhodes v. State,* 50 Ala.App. 661, 282 So. 2d 100.

■ There was no error in allowing Sandra Shaneyfelt and Ernest Wimpee, who had given statements to the prosecuting officers and who had agreed to testify against appellant, to testify to threats made against them by appellant if they took the stand against him. This was a bold attempt on the part of appellant to suppress testimony. *Ex parte State ex rel Attorney General, Whatley v. State,* 209 Ala. 5, 96 So. 605; *Sandlin v. State,* 25 Ala.App. 311, 146 So. 82; *Ellis v. State,* 46 Ala.App. 289, 241 So.2d 130.

■ Testimony of victim of alleged robbery which was offered to establish the identity of the defendant as one of the alleged robbers presented a jury question on that issue. *Carpenter v. State,* 42 Ala.App. 618, 174 So.2d 336; *Poole v. State,* 53 Ala.App. 156, 298 So.2d 85, reversed on other grounds, 292 Ala. 590, 298 So.2d 89.

The testimony of the State Trooper with reference to the driver's license being used by Sandra Shaneyfelt was strong corroborative evidence of her testimony as well as the testimony of Wimpee.

In *Seawright v. State,* 52 Ala.App. 286, 291 So.2d 376, this court said:

"Corroborative evidence necessary to justify admission of an accomplice's testimony need not be strong or sufficient in and of itself to support a conviction but the only requirement is that it legitimately tends to connect the accused with the offense. A liberal construction is to be accorded the statute requiring that the testimony of an accomplice be corroborated by other evidence. *Magouirk v. State,* 49 Ala.App. 420, 272 So.2d 625; *Cameron v. State,* 49 Ala.App. 482, 273 So.2d 242; *Moore v. State,* 30 Ala.App. 304, 5 So.2d 644."

Appellant strongly contends that the trial judge's conduct during the trial was prejudicial to the defendant. He claims that the judge made statements concerning the introduction of a number of photographs into evidence which showed impatience and disfavor for the defendant and affected the outcome of the trial. We quote from the record:

"(Whereupon Defendant's Exhibit No. 5 for Iden. was received in evidence as Defendant's Exhibit No. 5. See the next page for this exhibit.)

THE COURT: Do you have any more of those pictures you are going to want to offer in evidence?

MR. CARPENTER: Yes, sir.

THE COURT: Would you just mark them all now and see if you and the District Attorney can't agree on it.

Q. At this point?

THE COURT: If you would like to. That is the customary way to speed things up."

Not by the broadest stretch of one's imagination can it be said that the above quoted excerpt reflects prejudice or impatience on the part of the distinguished trial judge. Judge Sullivan is one of the most conscientious and outstanding trial judges in this state or elsewhere. No error intervened here. *Allen v. State,* 290 Ala. 339, 276 So.2d 583.

Even if it could be claimed that the trial judge was in error in the statements he made with reference to the introduction of the photographs, nothing is presented to this court for review. Appellant made no objections and invoked no ruling from the court. *Barnett v. State,* 51 Ala.App. 470, 286 So.2d 876. *Jones v. State,* 50 Ala.App. 174, 277 So.2d 920.

We have carefully examined the record for errors injuriously affecting the substantial rights of appellant and have found none. Accordingly, the judgment of conviction must be affirmed and it is so ordered.

Affirmed.

All the Judges concur, except CATES, P. J., not sitting.