313 So.2d 195

**Barbara Ann ALLRED**

v.

**STATE.**

**4 Div. 259.**

Court of Criminal Appeals of Alabama.

March 4, 1975.

Rehearing Denied April 1, 1975.

Smith & Smith, Dothan, for appellant.

William J. Baxley, Atty. Gen., and Eric A. Bowen, Asst. Atty. Gen., for the State.

BOOKOUT, Judge.

The appellant was convicted by a Jury of murder in the second degree and sentenced to twenty years in the penitentiary. On October 1, 1970, the Grand Jury of Houston County, Alabama, charged Barbara Ann Allred with the first degree murder of James A. Allred by shooting him with a pistol. On October 23, 1970, she entered a plea of not guilty and not guilty by reason of insanity. On December 28, 1970, she was committed to Bryce Hospital in Tuscaloosa for an examination of her sanity. The Superintendent of Bryce Hospital rendered a report on February 5, 1971, certifying that appellant was insane on that date and at the time of the commission of the crime.

On February 23, 1971, a jury in Houston County found appellant to be insane. The court returned her to the state hospital until she was restored to sanity. She was released on August 16, 1971, and her case was set for trial on May 29, 1972. She was convicted of murder in the second degree, sentenced to fifteen years, and appealed her conviction. That conviction was reversed and remanded by this Court on May 3, 1973. The October 1, 1971, indictment was amended July 16, 1973, charging murder in the second degree, and the first degree murder charge was *nol prossed*. The conviction on the amended indictment is the subject of this appeal.

The charge arose from an incident occurring on the road known as the Graceville Cut-off in Houston County, Alabama, on July 17, 1970. Witness Harry Smith stated that about 1:00 P.M., he saw appellant and her husband, James A. Allred, standing by the car which had stopped on the edge of the road. Appellant was holding her husband. Mr. Allred waved for Mr. Smith to stop. Smith drove a bit further, turned around and came back to the

car where he found Mr. Allred lying in front of the car. As Smith approached the car, appellant was running toward him and threw something in the weeds along side of the road.

Smith stated that he asked appellant what was going on. Her reply was that her husband was beating her, and she shot him. Mr. Smith saw some wounds in Mr. Allred's body and noticed some bleeding. He further stated that appellant then went through her husband's pockets, and he heard Mr. Allred say, "Don't let her take it." A lady then stopped, and Mr. Smith had her call the police. They arrived in about thirty or forty-five minutes.

On cross-examination, Smith stated that appellant looked mean. He said she looked normal for a mean, mad woman and that she looked wild.

Clifford Rainey also stopped at the scene of the incident. He saw appellant standing by the body and heard Mr. Allred say, "Don't let her get it," as appellant went through his pockets. He also heard appellant say, "I wonder what they're going to do with me." He further testified that appellant had a crazy look on her face and that her clothes and hair were in a state of disarray and that she had a little trickling of blood coming out of the corner of her mouth.

Franklin T. Barber also stopped at the scene. He said he heard appellant say what she was interested in was what they would do with her. He stated that he noticed nothing abnormal with appellant and that she looked as calm as anyone.

Mrs. Runell Clark, Deputy Sheriff for Houston County, testified that she arrived at the scene at about 3:00 P.M. and saw appellant sitting in a police car. She took appellant to jail. She searched appellant and found four $50.00 checks, one check for $675.00, and one check for $18,437.65. All the checks were made out to Mr. and Mrs. James A. Allred and had not been endorsed. She also found a small red pack-age in appellant's purse containing $97.00 in cash and one .22 caliber bullet wrapped together. She stated that appellant was calm at the scene, but upon arriving at the jail, she sat down in the parking lot and screamed that she was not going to do "this and that." Further, the witness said that she had to pull appellant out from under a bed in the jail to get her to take some medicine prescribed by a doctor.

Joe Pitts, an investigator for the Houston County Sheriff's Department, testified that when he arrived at the scene, he examined the body of Mr. Allred. He had four bullet holes in him; one in the arm pit and three in the abdomen. The witness stated, "At the time I was kneeling beside the body, she made a statement to the effect that she wasn't going to let him beat her —." Appellant's objection to this testimony was overruled. Pitts said that he had talked to Mr. Smith and concluded that appellant was the chief suspect and arrested her immediately. He said that he did not talk to her before he arrested her. The court asked Pitts whether her statement was made before he arrested her. He said yes. The court also asked if appellant's statement was made before he talked with Smith. He said yes. At another time in his testimony, he stated that he talked to Smith, then formed the conclusion that appellant was the prime suspect and then arrested her.

Further, on cross-examination, it was revealed that at the preliminary hearing, Pitts had stated that he had not spoken to appellant. He said, however, that he did not say that she had made a statement. He stated at the preliminary hearing that she stood there and didn't say anything. However, it is clear from the transcript of the evidence that Pitts did not ask appellant any questions and that her statement was not in response to anything he had said or done. In addition, on cross-examination, Pitts stated that he made a note of the fact that she made a statement. The note read, "Made the statement, 'See how he beats me.'"

The following transpired with regard to the memorandum:

"Q. Nowhere in this testimony at a prior hearing on the 29th day of May, 1963,—1973, did you tell anything about her making a statement at that time, did you? You can examine it, if you would like?

"A. Without going back through and examining it, I wouldn't say.

"Q. Well, those matters were fresher on your mind at that time than they are now, aren't they—wasn't they, Mr. Pitts?

"A. Yes, sir.

"Q. And, as a matter of fact, in September of '70, at the preliminary hearing, and that was just right after it happened, wasn't it?

"A. Yes, sir, it was.

"Q. And you didn't mention anything about the statement at that time? Is that because you didn't recall the statement at that time?

"A. No, sir. I have the statement noted in my notes that I made shortly thereafter.

"Q. You've got it wrote down there then, is that right?

"A. Yes, sir. I did not quote the statement.

"Q. Let's see what you've got wrote down?

"A. Said, "Made the statement, 'See how he beat me' ".

"Q. You don't really know when she made the statement, do you?

"A. That was during the time that I was on the scene, before I placed her in the car, at the time when I was kneeling over the body.

"Q. But you don't know exactly when she made that statement? Whether it was when she was standing there before you had arrested her, or when it was do you?

"A. Yes, sir. I'm sure that it was before I arrested her.

"Q. Well, you don't—you don't recall—you didn't recall it in any other proceedings, so—

"MR. WHITE: We object to this. This is repetitious.

"Q. —the only thing that you really recall about it is the fact that it's wrote down, isn't it, Mr. Pitts?

"A. That's correct."

Pitts stated he then took appellant to a police car and gave her a "Miranda" warning. She stated that she wanted a lawyer, and no questions were propounded. When he first arrived at the scene, he did notice, "a small amount of blood trickling out the corner of her mouth."

Chief Deputy Sheriff, O. E. Jones, testified. He said that when he arrived, appellant was in a police car. He searched the area and found a .22 caliber revolver in the weeds a short distance from the Allred's car. There were five spent cartridges and one live round in the pistol. In a search at a later time, some live ammunition was found in the car's glove compartment. Also, another pistol was found in the trunk. A gun box with the number 938049 was also discovered in the trunk. This number was the same as the number found on the gun retrieved from the weeds.

It was stipulated that a State Toxicologist would testify that Mr. Allred sustained four gun shot wounds. He would also testify that Allred died from shock, hemorrhage and trauma associated with these wounds.

The State then rested its case. There was no Motion to Exclude the State's Evidence.

Rosendolph Smith testified on behalf of appellant. It was his testimony that Mr.

Allred and his wife passed his car on the Graceville Cut-off and that they were fighting. He did not lose sight of their car and in a short while the car stopped. Mr. Allred had appellant down on the front seat of the car and was "a chuggin" her with his fist. He said Allred was, "hitting her pretty pert." The time was about 1:00 P.M. on July 17, 1970.

A deposition of Frances D. Etheridge was admitted into evidence. She is the custodian of medical records at the Jackson Memorial Hospital in Miami, Florida. Appellant was admitted to the hospital on August 5, 1969, by James Allred. Her medical records were admitted into evidence without objection.

Mrs. C. R. Britt testified that she knew the Allreds and that Mr. Allred was with her two or three weeks before his death. He told her that his wife was sick and that he wanted to place her at the Chattahoochee Hospital for mental patients in Florida. On cross-examination, she said that appellant acted irrational once six years ago when she beat her fists on a table in her home.

By stipulation, six of appellant's letters written to Mrs. Turner, were admitted into evidence. The contents were that appellant thought her husband was seeing another woman, and' that he wanted to put his wife into a mental hospital. The letters also state that Mrs. Allred was weak and very nervous. Further, Mrs. Turner would say that when she saw appellant in jail, she was very irrational and hid under the bed.

Marie McQuagge, clerk of the Houston County Circuit Court, was the forewoman of a jury which found appellant insane on February 23, 1971. She said that a report was received from Dr. Donald D. Smith, Superintendent of Bryce Hospital, finding appellant to be insane. The report from Dr. Smith stated that she was insane at the time of their observation and at the time of the shooting.

Dr. Hardin M. Ritchey, a Psychiatrist at the Hill Crest Hospital in Birmingham, Alabama, stated that appellant was admitted there on October 28, 1970. Her condition was diagnosed as acute schizophrenia which is one of the most serious mental diseases. It was his opinion that she was suffering from the disease in July, 1970.

Gordon Brown, Mr. Allred's former supervisor, stated that he knew the Allreds. One time, appellant came to him to request his intercession between her and Mr. Allred. She told him that her husband would not give her money to go to the hospital. The witness further said that Mr. Allred was extraordinarily frugal with his money. He would not spend money for glasses for his child who was almost blind until the child went to school. He also stated that in his opinion, appellant was insane.

Mr. James Elwood Rawls, a Baptist minister, counseled appellant seven or eight times in 1969. He said she was insane at times and grew progressively worse. He said that appellant went to the James Archer Smith Hospital in Homestead, Florida, and then to Jackson Memorial in Miami.

The deposition of Dr. Raymond Cressie, M.D., of Homestead, Florida was admitted. He is a surgeon and saw appellant and Mr. Allred. Mr. Allred complained that appellant was mentally ill and that he wanted her committed. The witness referred appellant to Jackson Memorial.

Dr. Donald D. Smith testified that he was the Superintendent of Bryce Hospital and had reported on appellant's condition. He stated that she was insane at the time of her husband's death.

On rebuttal, the State called Marie McQuagge. She was on the jury on August 16, 1971, which found appellant sane and competent to stand trial.

Mrs. Ruth Bea Smith and Mrs. McNutt, both sisters of Mr. Allred, stated that they knew appellant and saw her in their homes

shortly before Mr. Allred's death. They said that appellant was definitely sane. Mr. Allred's brother, W. F. Allred, stated substantially the same thing.

After the verdict was rendered and judgment set, appellant moved for a new trial and moved to examine the jury rolls. On the hearing to examine the jury rolls, appellant contended *inter alia* that the working class of people in Houston County were excluded in favor of executives, businessmen and heads of corporations.

Mrs. Louise King, a member of the jury commission stated that the commission attempted to get a good cross section of citizens to fill the jury roll. She said that the jury roll consists of citizens from all walks of life and that they try to vary the occupations of those summoned to jury duty. A list of the citizens of the venire for this particular case was admitted into evidence. It is apparent that the venire consisted of citizens from all walks of life and with varied occupations (e. g. farmers, merchants, mail carriers, salesmen, laborers, realtors, and an artist). The motion was overruled.

On the hearing of the Motion for New Trial, appellant contended that she was prejudiced because a member of the Sheriff's Department had charge of the jury during a lunch and supper recess. Deputy "Bubba" Boyett and Deputy Bess Cameron had charge of the jury at these recesses. Neither of them testified in the trial and were not connected with the case. Both were sworn as bailiffs for that week. Neither discussed the case with the jury, and the jury did not discuss it with them. The motion was denied.

### I

It is urged that the court erred to a reversal in admitting appellant's statement to the effect that she was not going to let her husband beat her. Appellant contends that she had not been advised of her constitutional rights prior to her making the statement and that its admission was, therefore, error. With this, we cannot agree. In Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, the Supreme Court of the United States expressly said, "We deal with the admissibility of statements obtained from an individual who is subject to custodial police interrogation." Custodial interrogation is defined as questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his actions in any significant way. *Miranda*, supra; Truex v. State, 282 Ala. 191, 210 So.2d 424, and Manning v. State, 51 Ala.App. 538, 287 So.2d 248. From the facts, we conclude that the statement made by appellant was a spontaneous declaration and that the statement was not rendered as a result of any interrogation by Officer Pitts. The admission of such statements is not error. United States v. DeBose, 2 Cir., 410 F.2d 1273, and Bedingfield v. State, 47 Ala.App. 677, 260 So.2d 408.

### II

Appellant further contends that the alleged confession was not the product of a rational intellect and a free will thus rendering the statement inadmissible.

The Supreme Court of Alabama, through Simpson, J., stated in Goldin v. State, 271 Ala. 678, 127 So.2d 375, that:

". . . The fact that an accused is not in full possession of his or her mental faculties when the confession is made does not render it inadmissible, but only affects the weight to be accorded by the jury; or is provable merely to support other evidence that the confession was not voluntary. To render such a confession inadmissible on that ground the mania must have been such that the accused was either an idiot or a lunatic during lunacy. Redwine v. State, 258 Ala. 196, 61 So.2d 724."

Also in Elrod v. State, 281 Ala. 331, 202 So.2d 539, the Supreme Court of Alabama,

through Merrill, J., stated the proposition as follows:

"... Accused's intelligence, character and situation at the time of the confession of the crime charged are important considerations in determining whether the confession was voluntary, but the fact that accused was of tender age or weak intellect will not alone render the confession inadmissible in evidence as involuntary. State v. Ashdown, 5 Utah 2d 59, 296 P.2d 726, affirmed 357 U.S. 426, 78 S.Ct. 1354, 2 L.Ed.2d 1443. Evidence tending to show a defendant's weak mentality, feeblemindedness, and mental stress does not affect the admissibility of the confessions, but rather is a matter that bears on the weight, credibility and effect to be given the confessions by the jury. State v. Stewart, 238 La. 1036, 117 So.2d 583.

.      .      .      .      .      .

"We have said that a 'person may be partially insane and still be competent to testify or make a confession.' The (sic) involves an inquiry into his appearance, demeanor and the nature of his statements. It is for the court to determine whether he has or had the requisite intelligence and ability to communicate his responses to questions. Redwine v. State, 258 Ala. 196, 61 So.2d 724. . . ."

The Alabama Court of Criminal Appeals, through Harris, J., quoted the above propositions in Barnett v. State, 51 Ala. App. 470, 286 So.2d 876, cert. denied, 291 Ala. 773, 286 So.2d 890.

■ This Court is not unaware of the United States Supreme Court decision of Blackburn v. State of Alabama, 361 U.S. 199, 80 S.Ct. 274, 4 L.Ed.2d 242, wherein petitioner's confession was held inadmissible because the evidence indisputably established the strongest probability that Blackburn was insane and incompetent at the time he allegedly confessed. This coupled with an eight or nine hour interrogation by law officers brought about the conclusion that Blackburn's confession was involun-

tary. After a careful examination of the testimony of the instant case, we cannot say that the evidence here indisputably establishes the strongest probability of appellant's insanity.

The trial judge gave a lengthy and comprehensive charge to the jury on the question of sanity. At the end of the oral charge, defense counsel announced they were satisfied with the court's charge.

### III

■ It is appellant's contention that the court erred to a reversal in denying her Motion for a New Trial on the ground that members of the Sheriff's Department were given charge of the jury at lunch and supper recesses. It is the undisputed evidence that the two members of the Sheriff's Department, Deputies Boyett and Cameron, did not discuss the case with the jury, nor did the jury discuss the case with them. It is also undisputed that neither did the deputies take any part in the investigation of the case, nor did they testify in the case. Both of the deputies were sworn bailiffs for that week. Ordinarily the Sheriff and his deputies are the proper officers to have charge of the jury during their deliberations. Harris v. State, 233 Ala. 196, 172 So. 347 and King v. State, 266 Ala. 232, 95 So.2d 816. Each case is to be decided upon its own peculiar facts, and the test is not whether the conduct did influence the jury, but whether it might have. Bell v. State, 227 Ala. 254, 149 So. 687. We cannot say that the conduct here might have influenced the jury. There was no error in the denial of the Motion for New Trial on this point of law.

### IV

■ On direct examination, Deputy Pitts testified from his own recollection that appellant made the statement to the effect that she was not going to let her husband beat her. Appellant objected here on the ground that she had not been informed of her constitutional rights. On

**82**

cross-examination, Pitts revealed that he had recorded the statement in his notes that he had made shortly after appellant's statement was made. He further stated that the only thing he really recalled about the statement was the fact that he had written it down. Appellant contends on appeal that the first statement on direct examination is inadmissible because on cross-examination, the witness showed he did not know exactly what was said, but was reading from notes and that he admitted that he did not have an independent recollection. Therefore, the testimony should not have been admitted. However, appellant did not move to exclude Pitts' testimony regarding the statement he gave on direct examination. In absence of such motion to exclude, the trial court cannot be put in error for permitting the evidence to remain before the jury. Lett v. State, 19 Ala.App. 298, 97 So. 148, cert. denied, 210 Ala. 699, 97 So. 923.

V

 Through appellant's Motion for New Trial, the sufficiency of the evidence is properly before this court. Murder in the second degree is the unlawful killing of a human being with malice, but without deliberation or premeditation. Culbert v. State, 52 Ala.App. 167, 290 So.2d 235; Smith v. State, 47 Ala.App. 513, 257 So.2d 372; Young v. State, 47 Ala.App. 674, 260 So.2d 406; Miller v. State, 38 Ala.App. 593, 90 So.2d 166, and Warren v. State, 34 Ala.App. 447, 41 So.2d 201. Legal malice as an ingredient of murder is an intent to take human life without legal excuse, justification or mitigation, and it may be presumed from the use of a deadly weapon, unless the evidence which proves the killing rebuts the presumption. Harris v. State, 48 Ala.App. 723, 267 So.2d 512; Miller v. State, supra; Warren v. State, supra, and Coates v. State, 1 Ala.App. 35, 56 So. 6. The elements of the crime of second degree murder for which appellant was convicted were present. There was no

error in the court's denial of appellant's Motion for New Trial.

We have carefully examined the record in this case as required by Title 15, Section 389, Code of Alabama 1940, and find the same to be free from error.

Affirmed.

All the Judges concur.