BOOKOUT, Judge.
First degree murder; sentence: life imprisonment.
Mrs. Eunice Mae Lunsford was discovered dead in her bathtub on July 27, 1976. She had several cuts and bruises on her face and head. There was blood in the bathtub, on the floor in the bathroom and the hall, and on the walls of these two areas of the house. The wounds were insufficient in themselves to cause her death, but she was seventy-five years old and suffering from an advanced stage of hardening of the arteries. The physical and psychological excitement associated with her injuries caused her to die from a heart attack.
Robert E. Lunsford, son of the deceased, at the request of the police, prepared a list of items which were missing from his mother’s home. He also provided them with a list of names of persons who would have occasion to be at his mother’s home. The appellant’s name was included on this list as he often cut grass and did other such chores for Mrs. Lunsford.
The day after the discovery of Mrs. Luns-ford’s body, two police officers went to appellant’s home to ask him routine questions about his whereabouts the previous day. The appellant invited the officers to enter the house, and he then excused himself to go to the bathroom. One of the officers accompanied him. The officer, in response to a question by the defense attorney, said that he had no intention of letting the appellant out of his sight at that time. When the appellant came out of the bathroom, the officers asked him and his father if they could look around. Both of them consented. Almost immediately, one of the officers discovered several items in appellant’s dresser which had been listed as missing from the Lunsford home. Whereupon the officers placed the appellant under arrest and read him his Miranda rights. They again asked the appellant and his father if they could continue to search, and both again consented. Another item missing from the Lunsford home was located.
Appellant was taken to the police station around 11:00 or 11:30 A.M., and beginning at about noon, was questioned about the crime. At 4:05 P.M., he made a formal statement in which he confessed that he committed the crime.
The interrogation took place in a room approximately eight feet by twelve or fifteen feet in size. There were chairs and a desk in the room, and two officers were present most of the time. Appellant was not fed during the questioning and was crying and sniffling. No attorney was present.
The appellant’s emotional state was caused in large part by his confrontation with Mr. Lunsford during the interrogation. Mr. Lunsford testified that when he saw the appellant, he said, “Jimmie, mother is gone, but I have got to have the truth.” Mr. Lunsford, in referring to the situation, said that it was an “emotional thing.” He and the appellant had known each other for many years and had grown up together. Their families had been close, and appellant’s father had worked for the Lunsfords for almost twenty years. Mr. Lunsford said that Jimmie began to tell what happened after Lunsford asked him to tell the truth.
Appellant was given the appropriate Miranda warnings a total of three times during the day. He told the police that he understood his rights and wanted to talk with them. He said that he knew the difference between telling the truth and telling a lie, and that he would tell them the truth. He also said that he made the statement voluntarily and that he knew what voluntarily meant. He indicated in his statement that no reward or hope of reward had been offered him; that no one told him it would be better or worse for him to make a statement; and that no threat, force, or violence was used to get him to make the statement. The police officers verified these facts in their testimony. The appellant, however, testified that the police coerced him into making the statement.
Appellant was seventeen when he confessed. He could neither read nor write. *829 He had a speech impediment and had an I.Q. of 56. The police said that they discovered appellant’s handicaps early during the interrogation.
The appellant’s former teachers from the special education department at Woodlawn High School in Birmingham were called by the defense attorney to testify on behalf of the appellant. They explained to the court that an I.Q. score is indicative of whether someone is capable of learning. They said that a normal person’s I.Q. is between 90 and 110. A slow learner’s I.Q. falls between 80 and 89. An educable mentally regarded I.Q. score ranges between 56 and 80, while the trainable mentally retarded scores are between 30 and 55.
The teachers testified that appellant was on the borderline between educable mentally retarded and trainable mentally retarded. They explained that the difference is that the educable mentally retarded student can be taught to read up to about a fourth grade level and to do simple tasks so as to become partially employable. The trainable mentally retarded student, on the other hand, can only be trained to take care of his daily needs. All of the appellant’s teachers, after having worked with him, agreed that he was more trainable than educable. They testified that his specific problems were retention and conceptionalization. For example, they said he would memorize a word one day and by the next have completely forgotten it. He also had trouble remembering his class schedule, and at times would have to be led from class to class. They testified that appellant could comprehend some written concrete words if the pictures were with them, but he was completely unable to deal with written abstract words. They defined abstract words as those which cannot be visualized such as, “if, when, the, those.” The teachers testified that appellant’s performance was worse when he was under stress.
On direct examination, the defense attorney asked the teachers whether appellant was capable of understanding the sentences in the Miranda warning. The first teacher said he was not capable. The second teacher agreed and added that the word “rights” is an abstract word, and she was sure that it would not be in appellant’s vocabulary.
On cross-examination of the first teacher, the following exchange took place:
“Q. The question or the sentence, ‘You have the right to remain silent.’ Could Jimmie understand that sentence?
“A. If I said, ‘Jimmie, you don’t have to tell me anything if you don’t want to.’ He would understand that. Remain he might not know. Silent he would probably know. If I said, ‘Jimmie, you don’t have to tell me anything.’
“THE COURT: What about ‘talk to a lawyer?’
“A. ‘Talk to a lawyer.’ Yes.
“THE COURT: Would he understand that?
“A. Yes, he probably knows what a lawyer is. He’s probably watched television. “THE COURT: I mean, just asking you. “A. Yes, he knows what a lawyer is. “THE COURT: Sentence like, ‘You have a right to talk to a lawyer.’ He would know what it means?
“A. Yes, sir.
“THE COURT: ‘Have one here while you’re being questioned.’ Would he understand that?
“A. I don’t know. I really and truly cannot tell you.
“Q. ‘Anything you say can and will be used against you in a court of law.’ Would he understand that statement?
“A. I don’t know.
“THE COURT: Ma’am?
“A. I really don’t know. If you broke it down and you went over it several times and you said, ‘Jimmie, this is what’s going to happen and this is the way it is,’ and you have verified this with him each step as you went along.
“Q. ' Would he understand the sentence, ‘You can decide at any time to exercise these rights and not answer any questions or make any statements?’
“A. He would probably understand the statement, but exercise his rights. I don’t know whether he would know what his rights were.”
*830 This teacher further testified on cross-examination that:
“A. It’s my opinion that if the statement were read to Jimmie at the same speed it was read to me and that he said, ‘Do you understand this’ and Jimmie would probably say yes. I don’t know if he would have understood it, and I don’t think he would have understood half of it. But Jimmie was very eager to please.”
She also testified, that even if the statement was read to him three or four times over the course of a couple of hours, he would probably not understand them more.
The second teacher testified as follows on cross-examination:
“Q. Mrs. Weaver, the sentence, ‘Do you have the right to remain silent.’ Would he understand that sentence?
“A. I really don’t know. I would be more willing to say that he wouldn’t understand than he would.
“Q. Yes, ma’am, but you don’t know.
“A. No.
“Q. The sentence, ‘Anything you say. can and will be used against you in a court of law.’ Would he understand that?
“A. I do not believe he would.
“Q. Sentence, ‘You have the right to talk to a lawyer.’ Well, that’s part of the sentence. Would he understand that, ‘You have the right to talk to a lawyer?’ Just such a statement.
“A. I really don’t know.
“Q. ‘And have him present with you while you’re being questioned.’ Do you think he would understand that or do you not know?
“A. I don’t know.
“Q. If you cannot afford to hire a lawyer, one will be appointed to represent you before any questions.’ Would he understand that question?
“A. I doubt it.
“Q. Would he understand this sentence, ‘You can decide at any time to exercise these rights and not answer any questions or make any statements.’ Do you think he would understand that?
“A. I do not think he would.
“Q. If after he was read those sentences and then he was asked, ‘Do you understand each of these rights I have explained to you?’ And he answered, ‘Yes, sir.’ Do you think he—
“A. I really don’t believe he would truly understand what it was all about.
“Q. Then in response to the question, ‘Having these rights in mind, do you wish to talk to us now?’ And he answered, ‘Yeah.’ Do you think he would have some idea what they were talking about? “A. No.”
She also testified that appellant had the intelligence to make accurate responses to simple questions. She was also of the opinion that appellant did understand and accurately answered the questions during his interrogation by the police. She reached this conclusion because the answers verified the details of the scene of the crime.
I
Appellant’s first contention is that he did not voluntarily, knowingly, and intelligently waive his constitutional protections against self-incrimination. The appellant relies primarily upon Fikes v. Alabama, 352 U.S. 191, 77 S.Ct. 281, 1 L.Ed.2d 246 (1957), Gallegos v. Colorado, 370 U.S. 49, 82 S.Ct. 1209, 8 L.Ed.2d 325 (1962), and Haley v. Ohio, 332 U.S. 596, 68 S.Ct. 302, 92 L.Ed.2d 244 (1948), in support of his contention that the confession should not have been admitted into evidence. Those cases, however, are distinguishable on the facts from the present case. In Fikes, supra, the defendant was taken out of town to a state prison and kept in isolation for one week. He was questioned several hours at a time over the week, and his father and lawyer were barred from seeing him. In Gallegos, supra, the defendant, a fourteen-year-old boy, was held for five days without officers sending for his parents or seeing that he had advice of an attorney or friend. The police also did not immediately bring him before the juvenile court. In Haley, supra, a fifteen-year-old boy was questioned by police for about five hours beginning at *831 midnight. Several police questioned him in relays of one or two each. No friend or counsel of the boy was present. At no time was he advised of his right to counsel.
 Whether a confession is voluntary is a question of law to be decided by the trial court and such is subject to review on appeal. Harris v. State, 280 Ala. 468, 195 So.2d 521 (1967). This determination is to be made by examining the totality of the circumstances surrounding the confession. Wright v. State, Ala., 340 So.2d 74 (1976), on remand, Ala.App., 340 So.2d 80; Holmes v. State, Ala.Cr.App., 342 So.2d 28 (1977); Gamble v. State, 48 Ala.App. 605, 266 So.2d 817 (1972). In Allred v. State, 55 Ala.App. 74, 313 So.2d 195 (1975), cert. denied, 294 Ala. 751, 313 So.2d 203, cert. denied, 423 U.S. 859, 96 S.Ct. 113, 46 L.Ed.2d 86, this Court stated:
“Appellant further contends that the alleged confession was not the product of a rational intellect and a free will thus rendering the statement inadmissible. “The Supreme Court of Alabama, through Simpson, J., stated in Goldin v. State, 271 Ala. 678, 127 So.2d 375, that: “ ‘ . . . The fact that an accused is
not in full possession of his or her mental faculties when the confession is made does not render it inadmissible, but only affects the weight to be accorded by the jury; or is provable merely to support other evidence that the confession was not voluntary. To render such a confession inadmissible on that ground the mania must have been such that the accused was either an idiot or a lunatic during lunacy. Redwine v. State, 258 Ala. 196, 61 So.2d 724.’
“Also in Elrod v. State, 281 Ala. 331, 202 So.2d 539, the Supreme Court of Alabama, through Merrill, J., stated the proposition as follows:
“ ‘ . . Accused’s intelligence, character and situation at the time of the confession of the crime charged are important considerations in determining whether the confession was voluntary, but the fact that the accused was of tender age or weak intellect will not alone render the confession inadmissible in evidence as involuntary. State v. Ashdown, 5 Utah 2d 59, 296 P.2d 726, affirmed 357 U.S. 426, 78 S.Ct. 1354, 2 L.Ed.2d 1443. Evidence tending to show a defendant’s weak mentality, feeble-mindedness, and mental stress does not affect the admissibility of the confessions, but rather is a matter that bears on the weight, credibility and effect to be given the confessions by the jury. State v. Stewart, 238 La. 1036, 117 So.2d 583.’ ”
In Twymon v. State, Ala.Cr.App., 358 So.2d 1072 [Ms. April 18, 1978] released this date, we held that the fact that Twymon, a thirty-three year old, “had an I.Q. of 57, which would be roughly equivalent to the mental age of nine years and two months, is only one factor to be considered in determining the voluntariness of his confession. Goldin v. State, 271 Ala. 678, 127 So.2d 375 (1961). . . . ” However in Twymon, there was the additional testimony that, regardless of his mental age, Twymon would have been able to understand his rights and thus make a free and knowing waiver.
Likewise, in determining the volun-tariness of a minor’s confession, the totality of the circumstances must be considered. Both age and education of the accused are merely factors to be considered with all the surrounding circumstances in making the voluntariness determination. Thus neither age, nor mental subnormality, standing alone, render a confession involuntary. Parker v. State, Ala.Cr.App., 351 So.2d 927 (1977), cert. quashed, Ala., 351 So.2d 938.
Great weight should be accorded the trial court’s determination of voluntariness, Harris, supra, and that decision should not be overturned unless there was an abuse of discretion. Holmes; Elrod, supra.
“Even where there is credible testimony to the contrary, if the evidence is fairly capable of supporting the inference that the rules of freedom and voluntariness were observed, the ruling of the trial judge need only be supported by substantial evidence and not to a moral certainty. *832 . ” McNair v. State, 50 Ala.App. 465, 280 So.2d 171 (1973), cert. denied, 291 Ala. 789, 280 So.2d 176.
In the instant case, the trial court admitted the confession. It did so because of express findings in an extensive pretrial hearing that there was no particularly overbearing police conduct, no coercion, no trickery, nor exhausting questioning over an extended period of time. The trial court felt that the appellant completely understood the significance of the recovery of the items missing from the Lunsford home and that this contributed to his decision to talk to the police. The trial court also found that appellant’s emotional distress during the questioning was more readily attributable to remorse rather than any sort of coercion on the part of the police. The trial court concluded that appellant had the intelligence to understand and respond to certain basic questions and could voluntarily, intelligently, and knowingly waive his rights. Although an extremely close question is presented, this court, after an examination of the record, cannot find that the trial court abused its discretion in finding the confession admissible. See also: Myles v. State, Ala.Cr.App., 354 So.2d 842 (1978).
II
Appellant contends that the consent to. search his house was not freely and voluntarily given.
Searches without warrants are constitutionally permissible when executed with the consent of the owner. Bumper v. North Carolina, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968); Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938); Welden v. State, 57 Ala.App. 379, 328 So.2d 630 (1976). The burden of proving consent is on the party alleging the waiver of rights against warrantless searches and seizures. Kelley v. State, 55 Ala.App. 402, 316 So.2d 233 (1975).
The voluntariness of consent to search is a question of fact to be determined from the totality of the circumstances surrounding the event. Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). “To justify the introduction of evidence seized by a police officer within a private residence on the ground that the officer’s entry was made by invitation, permission, or consent, there must be evidence of a statement or some overt act by the occupant of such residence sufficient to indicate his intent to waive his rights to the security and privacy of his home and freedom from unwarranted intrusions therein.” (Emphasis supplied.) Knox v. State, 42 Ala.App. 578, 172 So.2d 787 (1965). Where the evidence is in conflict, the trial court is in the best position to determine consent or lack thereof. Holmes, supra.
In the instant case, there was evidence that the appellant invited the police officers into the house. There was testimony that both the appellant and his father agreed to allow the police officers to make the search. There was also evidence that after the appellant’s arrest, both he and his father affirmatively consented to the continued search, even after appellant’s father was told that he had the right not to let the police search and that he could stop the search if he wished.
We hold that the statements and acts of the appellant and his father were sufficient to establish consent to the search. This is true notwithstanding the conflict between the testimony of the appellant’s father and that of the police. The trial judge was in the best position to resolve that conflict, and the record does not disclose that he abused his authority in reaching his decision.
Ill
Appellant contends that a photograph, State’s Exhibit 30, should not have been admitted into evidence because it contained nothing which bore on any issue at the trial and its probative value was outweighed by its inflammatory and prejudicial nature.
In Fletcher v. State, 291 Ala. 67, 277 So.2d 882 (1973), the Supreme Court of Alabama stated:
*833 “Photographs are admissible into evidence if they tend to prove or disprove some disputed or material issue, to illustrate or elucidate some other relevant fact or evidence, to corroborate or disprove some other evidence offered or to be offered. . . Their admission is within the sound discretion of the trial judge. ...”
The photograph objected to shows a frontal view of Mrs. Lunsford after she was removed from the bathtub. It shows very clearly the bruises on her face and, as the bruises were relevant to the cause of death, the photograph was properly admitted. See also: Lewis v. State, Ala.Cr.App., 339 So.2d 1035, cert. denied, Ala., 339 So.2d 1038 (1976); Hall v. State, 50 Ala.App. 666, 282 So.2d 104 (1973).
IV
Appellant contends that the oral charge should not have discussed the felony-murder doctrine because he had no notice that the State’s case was predicated upon the felony-murder doctrine.
The indictment, omitting the formal portions, reads as follows:
“ . . . Jimmie Lee Garrett, Jr., whose name is otherwise unknown to the Grand Jury, unlawfully, and with malice aforethought, killed Eunice Mae Luns-ford by striking her on the head with a blunt instrument, or by means otherwise unknown to the Grand Jury. .
This indictment tracks the code form for murder. Title 15, § 259, Form 79, Code of Alabama 1940. This form has been used and approved in past felony-murder cases. Harvey v. State, Ala.Cr.App., 341 So.2d 187 (1977). The trial court’s reference to the felony-murder doctrine in the oral charge was therefore not error.
AFFIRMED.
All the Judges concur.