[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 751 
Late in the night of October 3, 1974, the appellant shot and killed her two young children and in an apparent suicide attempt took a large quantity of prescription drugs from which she almost died. This appeal is from her conviction and life sentence in the death of two year old Monty J. Carroll, her youngest son.
 I
At trial the State introduced testimony of four statements made by the appellant while she was in a hospital recovering from her attempted suicide. The appellant contends that the admission of these statements was error because the trial judge did not make a determination of voluntariness before their admission and because the appellant *Page 752 
was incompetent to make a voluntary and admissible confession.
Soon after the appellant was discovered around midnight on October 3, 1974, she lapsed into a deep coma and appeared to be suffering from a "very classic drug overdose". She was taken to a local hospital where her stomach was pumped. Within hours she was transferred to the University Hospital in Birmingham, Alabama, where she was placed on an artificial kidney machine. Within thirteen hours after her admission to the University Hospital, the appellant "began to be rousable". On October 5th, she was able to breathe on her own and dialysis was discontinued. The appellant remained in the intensive care unit until she was "physically stable" and on October 8th she was transferred to the psychiatric ward. During the time spent in intensive care the appellant received no drug which would "alter her mental state". The appellant remained in the psychiatric ward for approximately one month.
At trial the defense presented expert testimony that the appellant had no recollection of what had happened from the early evening of the day of the murders until waking up in the hospital. A psychiatrist testified that only under the influence of sodium amytal, a powerful sedative, was the appellant able to recall any facts surrounding her drug overdose or the deaths of her children. Another psychiatrist testified that the appellant suffered a "relative kind of amnesia" and that in relative amnesia there could be "patches of memory". This psychiatrist also testified that the appellant appeared not to know what had happened and was "groping for memory".
 A.
While the appellant was in intensive care, Diane Ballard, who characterized herself when asked as the appellant's "best friend in Birmingham", came to visit her. From the record objection to the first statement appears.
 "Q. (Assistant District Attorney): What was the first thing either you or she said when you went in that room?
 "MR. HARD (Defense Counsel): May we approach the bench, Your Honor?
"THE COURT: Yes.
 (Whereupon, an off the record discussion was then had at the bench.)"
* * * * * *
"Q. Go ahead.
 "MR. HARD: For the record, I would like to object on two grounds. Number one, Mr. Barber's own evidence discloses that the Defendant was in the intensive care at the University Hospital. "I personally, tomorrow, Thursday or whenever we get into it, will proffer to the Court evidence that she was under medication at that very time[1], and suggest to the Court that whatever she said at that time was not volitional, that she could not be held responsible for what was said on that particular occasion.
 "And secondly, as the Court knows, these statements were not made under oath in court. They are extrajudicial statements, and they are hearsay. And I object to them on that ground.
"THE COURT: All right. Overruled.
"MR. HARD: We respectfully except, Your Honor.
"THE COURT: All right."
After relating the general conversation had with the appellant, Mrs. Ballard testified:
 "Well, she asked me then had I seen Max (the appellant's former husband and the father of her two deceased children). And I told her yes, that I had. And she asked me how he was doing."
* * * * * *
 "Uh huh. And I told her yes, that I had seen him, and that he was in real bad shape, that he was just real bad off, that I had seen him at the funeral home. *Page 753 
"And she said well, I hope it drives him crazy. That's all she said then."
There was no further objection or motion to exclude this testimony.
It is settled in Alabama that admissions relating directly to the facts or circumstances of the alleged crime and connecting the defendant therewith are inculpatory admissions in the nature of a confession and subject to the same rules as direct confessions. Reeves v. State, 260 Ala. 66, 73, 68 So.2d 14
(1953); Campbell v. State, 341 So.2d 735, 740 (Ala.Cr.App.), affirmed, 341 So.2d 742 (Ala. 1976); Kendrick v. State,55 Ala. App. 11, 312 So.2d 583 (1975). Admissions as to purely collateral matters, which are not confessory of guilt in any respect, are not within the scope of this rule, and the predicate as for a confession need not be laid. Tillison v. State, 248 Ala. 199, 27 So.2d 43 (1946); Herring v. State, 242 Ala. 85,5 So.2d 104 (1942); Twymon v. State, 358 So.2d 1072 (Ala.Cr.App. 1978);Campbell v. State, 341 So.2d at 740; C. Gamble, McElroy's AlabamaEvidence § 200.02 (4)(e) (3rd ed. 1977). The appellant's statement that she hopes "it" drives her former husband crazy cannot be construed as a confession or an admission of guilt. It does not tend to incriminate or connect her with the murder of her child. Therefore the State was not required to prove that the admission was voluntary and the trial judge had no duty to determine its admissibility. The objection of defense counsel is not well taken.
 B.
Several days later, either the first or second day after the appellant had been transferred to the psychiatric ward, the appellant called Mrs. Ballard on the telephone. Either that night or the next Mrs. Ballard went to see the appellant. Defense counsel again objected to the contents of any conversation between the two women.
 "Q. Do you recall the subject matter of that conversation?
 "MR. HARD: I would like for the record to state that I just think it's inherently distastful to have the statement of a patient in the psychiatric ward admitted into a court of law as proper evidence. And I would like to object to it.
 "THE COURT: Have you got any doctors coming from the psychiatric ward?
"MR. HARD: Yes, sir, I do.
 "MR. BARBER: Your Honor, by nature of the course that any criminal trial takes, I didn't arrange it. And I imagine it was arranged a long time before you or I were here.
 "The State has the burden of meeting the proof in a case. For that reason the State puts on their evidence first. And whatever evidence that the Defense has that it feels like is in defense of the matter, just by our system must come second.
 "MR. HARD: Your Honor, some matters are proper for the State to put on in rebuttal as opposed to being put on in the case in chief. And I submit to the Court that this is the very type of subject matter that we should not be going into in the State's case in chief.
"THE COURT: May I speak to the two lawyers.
 (Whereupon, an off the record discussion was then had at the bench.)
"THE COURT: Proceed, Mr. Barber."
Mrs. Ballard testified that she talked to the appellant for about one and one half hours. For the first hour it was "just mostly general small talk". Then the appellant "wanted to talk about the children" and "got emotional".
 "Q. Do you recall what was said by either of you about the children?
 "A. She was asking me about the funeral and how the children looked and what they were dressed in, and if they, you know, if they looked good. She wanted to know if everything was done right at the funeral.
 "And then she got real upset. And she told me that she missed them. And then she said this is not the way things are supposed to be. She said I'm supposed to be dead with my children. I'm supposed *Page 754 
to be with my children instead of up here. And the rest of it was just more or less — "I told her if she wanted to cry, you know, that she could cry to me. And it was just — the rest of it was more or less — She was just upset the rest of the night."
Again there was no further objection or motion to exclude this testimony.
This second statement was certainly no admission by the appellant that she killed her children or in any way harmed them — only that she was supposed to have died with them. While there are certain facts which tend to indicate that the confession was voluntary[2], we need not make that determination. Here, as inAllred v. State, 55 Ala. App. 74, 313 So.2d 195, cert. denied,294 Ala. 751, 313 So.2d 203, cert. denied, 423 U.S. 859,96 S.Ct. 113, 46 L.Ed.2d 86 (1975), we cannot say that the evidence indisputably establishes the strongest probability of appellant's insanity or incompetency[3].
Even assuming that this statement was an inculpatory admission requiring the laying of a predicate, we do not consider its admission error in view of the prior admission of the suicide letter written by the appellant and to which defense counsel specifically stated that he had "no objection". That letter reads:
"Dear Mother Daddy,
 "I'm sorry to do this to you'all but I can't take this life any more. I'm taking my boys with me. Please put one on my right and one on my left side. I love my boys and hope God forgives me and lets me be with them. I know in my heart that my boys will be with God. God please forgive me for I have sined.
 I love you Mother Daddy Eileen
 "Please dress the boys in blue they look good in it. Please put me between them I love them and want them to be in heven Gods heven. Please put with Monty Jay his night night blanket one that Mom made.
 "Please put with Jeff his little tiger that he got on his first Christmas on my bed.
"Read later
"Mother Daddy
 "Please let Gail have my side board and something else two
 "Please let Diane have something and also some clothes.
 "Mother Daddy let Jimmy Camille have something if they want it.
"Renea will help you'all two.
 Im Sorry I love youall Eileen"
Other incriminating statements made by the appellant were subsequently admitted without objection.
It is well settled that it is not error to allow facts to be shown over objection when they have already been admitted in evidence without objection. Bush v. State, 282 Ala. 134,209 So.2d 416 (1968); Espey v. State, 270 Ala. 669, 120 So.2d 904
(1960); Hendley v. State, 200 Ala. 546, 76 So. 904 (1917); Clarkv. State, 240 Ala. 65, 197 So. 23 (1940); Clarke v. State,32 Ala. App. 622, 29 So.2d 151 (1947). The suicide letter was a virtual and literal admission by the appellant of the crime for which she was convicted. The appellant had discussed taking her life and someone else's with Mrs. Ballard on "numerous occasions" prior to the October 3rd. *Page 755 
 "Most of the time she would talk about taking pills and ending her life. And on one occasion she said this was a very bad world the way that things were nowdays, and that her children would probably be much better off out of it."
There was no objection or motion to exclude this testimony.
Additionally it was defense counsel who fully explored what the appellant had stated under the influence of sodium amytal. While Mrs. Ballard testified, without objection, on direct examination by the State that she listened to a tape recording made of the appellant who was then under the influence of "sodium pentothal or something like that", defense counsel, over the State's objection, cross examined Mrs. Ballard on the contents of the tape recording.
 "Q. Please, ma'am, tell us what you remember hearing on the tapes.
 "A. I don't recall how they begin or anything. The doctor would ask her questions. And he would ask her if there was someone else there with her, if she could see someone else with her. And she said yes, that she remembered going to the door and letting Max in.
 "It seems like, to the best of my knowledge, that's how it started.
"Q. All right.
 "A. That Max had come to the house. And I believe there was a reference that he had hit her. And —"
* * * * * *
 "Q. All right. He gets in the house and hits her, and what else does she say, please, ma'am?
 "A. She said that she could remember the gun being on Monty J.'s dresser. And that she can remember being in Jeff's room. And that she can remember being given pills, that she can remember somebody forcing her to take pills or — The tape was really unclear. I couldn't understand a lot of it.
 "Q. Would it be fair to say in summary and form that the tapes in substance related a narrative wherein Max administered the drugs to Eileen —
"A. I think so.
"Q. — and that he shot the children?
"A. I think that is about it.
"Q. Was that in substance what you heard?
"A. Yes.
If illegal evidence is introduced over objection, the subsequent introduction of evidence of the same tenor, without objection thereto, renders harmless any error in overruling the objection. McElroy § 426.01 (20). In view of all the evidence admitted without objection, notably the suicide letter, the testimony adduced by defense counsel and the equivocal and ambiguous nature of this second statement, its admission was harmless error. Alabama Rules of Appellate Procedure, Rule 45.
 C.
While the appellant was still in the psychiatric ward, the appellant had another conversation with Mrs. Ballard. This constitutes the third admission objected to on appeal.
 "Q. What was the discussion at this time that you are speaking of?
 "A. She wanted to discuss the children at that time. And she had a photo album. And she looked through the album and talked about the children.
 "And she at that time told me that she had had a dream or that she thought that she had had a dream, she couldn't remember whether it was real or a dream. And she could remember seeing Jeff in a terrible situation. And she described it to me and told me that she didn't know whether it was real or something that she just remembered, just dreamed since she had been in the psychiatric ward.
 "Q. What series of events or happenings did she describe to you?
 "A. She just said that she dreamed that she was walking through the house or that she would see herself walking through the house and that she could see herself going into Jeff's room. And she described the image of a child laying on his bed, and that he was dead, and that there was a lot of blood. And she described a horrible look on his face. *Page 756 
"Q. Did she discuss that any further?
 "A. No. She just told me that she couldn't remember seeing Monty, that she could just remember seeing Jeff.
 "Q. Did she at any other time, other that the time that you have already testified to, did she talk to you about what happened the night of October the 3rd?
 "A. A little while later she told me that they had given her a test, and that they had made a tape recording under the influence of sodium pentothal or something like that. And I listened to the tape recording. And it seems that I listened to the tape recording two or three times."
Defense counsel made no objection or motion to exclude any of this testimony.
 D.
The fourth statement of the appellant, the admission of which is challenged on appeal, concerns an incriminating admission made to Ms. Robbie Ollifant, another friend of the appellant. Ms. Ollifant testified that the appellant telephoned her about one and one half to two weeks after the murders while the appellant was in the psychiatric ward. Defense counsel made no objection or motion to exclude this testimony.
 Ms. Ollifant stated that the appellant "asked me how I was doing. And I told her fine. And she said have you heard what I have done. And I said yes. She said who told you. And I told her that Doris Lennon had called.
 "And she wanted to know if it was in the newspapers or anything like that up there. And I told her yes, that it had been in the Saturday afternoon paper.
 "Q. Did y'all have any further conversation at that time?
 "A. Yes. She went on to tell me, to describe to me the children in their coffin, what they had with them, how they were dressed. And she went on, and I asked her why, you know, what happened, and if she had had anything to drink — No. I asked her if she had taken anything, what she had taken.
 "And she said that she did not take any drugs, that she had had only two drinks that night. And I asked her if she remembered anything about that night. And she said that she remembered going into Monty J.'s room.
 "Q. Did she tell you anything else that she remembered about that particular night of October the 3rd, what transpired?
 "A. Well, I don't believe it was that night that she may have remembered this. But she said that she had a picture of Jeffery laying kind of on a side angle with his eyes open in his bed.
 "Q. Did she tell you — All right. Now, this last statement that you have made, was this during this first telephone conversation?
"A. Yes.
 "Q. Okay. Did you inquire or did she tell you any other specifics that she remembered about that night?
 "A. She said that she just remembered going into Monty J.'s room and (pause) shooting him. And I asked her if — why she had unloaded and reloaded the gun. And she said she didn't remember that. And she asked me where I had heard that. And I just told her that someone had told me that the gun had been unloaded and reloaded.
 "Q. Did y'all — Did she discuss or mention the gun any further after that?
 "A. She said that the gun had been found in the old hiding place.
"Q. Did she tell you where that was?
 "A. No, sir. She said that she had a new hiding place for it, and that no one knew where the new hiding place was but herself. But that the gun was found in the old hiding place."
During the same conversation, the appellant told Ms. Ollifant, who lived in Nashville, Tennessee, that she wanted her to come down and see her. Ms. Ollifant agreed to try and come that weekend.
During the first telephone call with Ms. Ollifant, the appellant "just went on into detail to tell me that she had been in the intensive care"; that she knew her children *Page 757 
were dead; that "Max, her ex-husband, made her do it because his money meant more to him than his children". The appellant also told Ms. Ollifant that
 "she had left a note stating that she wanted the children to be buried one on each side, and why she had done it, and she could not go on living in this life any longer the way she was living.
 "And she told me that when she was in Nashville. And that they believed that the note was a forgery because the handwriting was more legible than her handwriting."
On Sunday, when Ms. Ollifant did not come to visit the appellant as she was supposed to, the appellant telephoned her a second time and asked why she didn't come. She told Ms. Ollifant that her lawyer had been waiting to talk to her that day. The only thing the appellant said with reference to the killing was that "they had gotten a lawyer and he was working on it".
As noted, there was no objection of any type made to these last two statements. No "continuing objection" was requested to the admission of any statement made by the appellant and there was no motion for a new trial. The law is clear in this state that an accused may waive the rule as to the prima facie inadmissibility and incompetency of a confession without a proper predicate by failing to interpose a timely objection. Peoples v. State,256 Ala. 612, 56 So.2d 665 (1952); Shiflett v. State, 52 Ala. App. 476, 294 So.2d 444, cert. denied, 292 Ala. 749, 294 So.2d 448
(1973); Wilkerson v. State, 50 Ala. App. 150, 277 So.2d 423, cert. denied, 291 Ala. 802, 277 So.2d 427 (1973); Moore v. State,44 Ala. App. 113, 203 So.2d 460, cert. denied, 218 Ala. 723,203 So.2d 465 (1967); Lipscomb v. State, 32 Ala. App. 623,29 So.2d 145 (1947); Ray v. State, 29 Ala. App. 382, 197 So. 70, cert. denied, 240 Ala. 73, 197 So. 73 (1940); Jones v. State,23 Ala. App. 384, 125 So. 898 (1930).
While it is not always necessary to repeat the specific grounds for an objection each time a question is asked, if there has been a proper objection previously made to the same evidence and the trial court had been made fully aware of the ground of that objection, Anderson v. State, 354 So.2d 1156, 1160 (Ala.Cr.App.), cert. denied, 354 So.2d 1161 (Ala. 1977), here there were four different admissions made to different people under different conditions. Under these circumstances defense counsel was not being required to do a useless thing, Nobles v. State,30 Ala. App. 434, 7 So.2d 770, cert. denied, 242 Ala. 643,7 So.2d 773 (1942), by objecting to each separate admission made by the appellant.
The entire defense was that the appellant was insane and under the influence of drugs at the time of the homicides. The jury could have considered the statements of the appellant as indications of her insanity as well as suggestions or admissions of her guilt. Clearly defense counsel did not intend to object to every admission made by the appellant as he specifically waived objection to the suicide note and introduced testimony of the contents of the amytal interviews. The State would have had a difficult task in proving the voluntariness admissibility of those interviews. Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745,9 L.Ed.2d 770 (1963); Blackburn v. Alabama, 361 U.S. 199,80 S.Ct. 274, 4 L.Ed.2d 242 (1960). For these reasons we find that objection was waived to the admission of these last two statements of the appellant.
 E.
On the question of the voluntariness of a confession, the burden is not on the trial court to withdraw the jury ex mero motu, hear evidence on the question of the voluntariness of a confession outside the jury's presence, and expressly rule. Statev. Wilbanks, 289 Ala. 166, 169, 266 So.2d 619 (1969). By its rulings on the objections and the admission of the confession into evidence, the trial court had determined its voluntariness.Pittman v. State, 36 Ala. App. 179, 180, 54 So.2d 630, cert. denied, 256 Ala. 369, 54 So.2d 632 (1951); Cork v. State,50 Ala. App. 670, 675, 282 So.2d 107 (1973). Here defense counsel made no request that a hearing be held *Page 758 
outside of the jury's presence to determine the voluntariness of the confessions and admissions of the appellant. Sanders v.State, 278 Ala. 453, 463, 179 So.2d 35 (1965). Quite the contrary, counsel stated that he would present evidence "tomorrow, Thursday, or whenever we get to it" that the first conversation the appellant had with Mrs. Ballard was not volitional because she was "under medication at that very time". However the trial judge is under no duty to "cast about and determine evidential existence" of the facts alleged by defense counsel in his objection to the admission in evidence of the confession. Price v. State, 52 Ala. App. 21, 25, 288 So.2d 803
(1974). The defense was not precluded in any fashion or degree from adducing evidence that the appellant's statements were involuntary. During the trial there was no motion to suppress any statement, inculpatory admission or confession made by the appellant. There was no motion for a new trial. In view of the facts that the appellant was in no wise precluded or hampered in adducing evidence on the question of voluntariness, specifically stated that evidence on this issue would be presented at a later time, did not request a hearing out of the presence of the jury and made no objection to the procedure followed by the trial court in considering the admissibility of the confession, we do not think that the trial court erred by not holding a voluntariness hearing outside the presence of the jury.
 II
During the testimony of defense witness Dr. Lionel Corbett, the physician in charge of the psychiatric services to which the appellant had been admitted, defense counsel requested the witness to read an "interpretation paragraph" of an electroencephalogram performed on the appellant by another physician. The prosecution objected to the witness reading "the report of the man who reviewed the brain wave recording", and the trial court sustained the objection. From the record it is apparent that Dr. Corbett was referring to some type of notes or record throughout his testimony. He stated that the "interpretation paragraph" was part of his "file". This file was never specifically identified or introduced into evidence. Likewise, no medical records were offered or introduced into evidence.
The rule is that
 "if a hospital record of a physician's diagnosis of a patient in the hospital is shown to have been made in conformity with the Business Records Act, then such record is admissible even though the diagnosis is an opinion because, if the physician were a witness, testimony by him as to the diagnosis would be admissible as an expert opinion." C. Gamble, McElroy's Alabama Evidence § 254.01 (4) (3rd ed. 1977).
Once a hospital record is shown to have been made in conformity with the Business Records Act, Rule 44, Alabama Rules of Civil Procedure, and the proper predicate is laid that the records were kept in the regular course of business, the diagnosis of the defendant by a doctor who does not testify at trial which is contained in the records, is competent and admissible evidence.Bailey v. Tennessee Coal, Iron and Railroad Company, 261 Ala. 526, 75 So.2d 117 (1954); Hall v. State, 248 Ala. 33,26 So.2d 566 (1946); Ward v. State, 44 Ala. App. 229, 206 So.2d 897 (1966), cert. denied, 281 Ala. 650, 206 So.2d 922 (1967); McElroy, § 254.01 (2) and (7). However expert witnesses, even physicians, cannot testify to the opinions of others in giving their opinions. McElroy, § 110.01 (3). Such testimony is hearsay.
Since no predicate was laid for the admission of the notes or file under the Business Records Act the trial court did not err in refusing to permit the defense witness to testify to that portion of the record stating the opinion and conclusions of another.
 III
During its case in chief the State introduced testimony concerning and a photograph of a second pistol found in the home of the appellant. This second pistol was, undisputedly, not the murder weapon and had no probative value on any question before the jury. *Page 759 
While the evidence concerning this second pistol was irrelevant and immaterial we fail to see how the admission of such evidence could have possibly injured or prejudiced the appellant. This second weapon was not used in any manner to identify or incriminate the appellant or to connect her with the crime charged. Under the facts and issues of this case the evidence of a second pistol was error without injury. Alabama Rules of Appellate Procedure, Rule 45.
 IV
It was not error to permit the State to introduce evidence of the homicide of Jeffrey Wade Carroll despite the fact that the appellant was only on trial for killing her other child, Monty Carroll. Under the evidence these two killings were inseparable parts of a single transaction.
 "Although the accused was not on trial for the killing of Ola Bee and Mattie Jean Posey, the three killings were parts of a single transaction, and were in fact inseparable. Each was of the res gestae of the other, and every fact and incident illustrative of one was competent also in illustration of the other. Keith v. State, 253 Ala. 670, 46 So.2d 705, and cases cited; Parsons v. State, 251 Ala. 467, 38 So.2d 209; Cantey v. State, 244 Ala. 108, 11 So.2d 844. Hence, the trial court did not err in permitting the State to prove the killing of Ola Bee and Mattie Jean Posey. Likewise, it was not error to permit the State to show the injuries to Lucy Posey and her physical condition at the time she was found. The attack on her was within the res gestae of the crime against her little brother and was admissible as shedding light on the acts, motive and intent of the assailant. Snead v. State, 251 Ala. 624, 38 So.2d 576, and cases cited." Smarr v. State, 260 Ala. 30, 34, 68 So.2d 6, 9 (1953).
Where the defendant kills two persons as a part of one transaction, evidence of both killings is admissible on the trial of the killing of one of them. Higginbotham v. State, 262 Ala. 236, 78 So.2d 637 (1955); Grissett v. State, 241 Ala. 343,2 So.2d 399 (1941); Granberry v. State, 182 Ala. 4, 62 So. 52
(1913); Lucy v. State, 340 So.2d 840 (Ala.Cr.App. 1976).
It was also not error to permit the State to prove prior acts of hostility by the appellant toward both victims since the two murders were inseparable and such evidence was admissible to show motive, malice and intent. The prosecution may prove former acts of hostility by the accused toward the victim for the purpose of showing motive and malice. Thigpen v. State, 50 Ala. App. 176,179, 277 So.2d 922 (1973); Gregg v. State, 106 Ala. 44,17 So. 321 (1895). While it is not permissible to show a difficulty between the accused and a third person not connected with the victim or the offense, Caylor v. State, 353 So.2d 8, 10
(Ala.Cr.App.), cert. quashed, 353 So.2d 11 (Ala. 1977), the third person in this case was a victim of a double murder occurring within the same time span and under virtually identical circumstances. "(E)very fact and incident illustrative of one was competent also in illustration of the other." Smarr,260 Ala. at 34, 68 So.2d at 9.
Evidence of recent abuse to the deceased child by the defendant is admissible to show intent, motive or scienter. Layne v. State,54 Ala. App. 529, 534, 310 So.2d 249 (1975), and cases cited;Cameron v. State, 24 Ala. App. 438, 136 So. 418 (1931).
 "While the details or merits of the former difficulty, or difficulties, cannot be brought out, yet sufficient of the details may be shown as may illustrate the gravity of the former difficulty. Spain v. State, 37 Ala. App. 311, 68 So.2d 53. "Particularly is this true as to former difficulties between a minor child and parent, since the law authorizes a parent to administer such corporal punishment as the misconduct of the child seems to warrant."
 Connell v. State, 39 Ala. App. 531, 538, 105 So.2d 695, cert. denied, 268 Ala. 692, 105 So.2d 700
(1958).
Furthermore, it was defense counsel who first interjected and explored the issue of whether the appellant was a "solicitous and tender-hearted mother", whether the deceased *Page 760 
was a "planned child", and brought out specific instances when the appellant cared for her children. Under these circumstances and applying the law as above stated, we hold the admission of testimony concerning the hostility of the appellant towards her children was not error.
 V
The appellant asserts that the trial judge erred when it refused to allow an alleged expert witness to testify to the condition of the appellant's mind at or about the time of the homicide.
Mrs. Thelma Mueller was a psychiatric social worker at the University Hospital. She was present when Dr. Corbett initially interviewed the appellant, at the two interviews when the appellant was given sodium amytal, and "had a great deal of informal contact, you know, on the ward" with the appellant. Mrs. Mueller also obtained a "background history" from the appellant's parents.
Specifically the appellant contends that the trial court erred when it sustained the prosecution's objections to the following questions asked by defense counsel of this witness.
 "Q. All right. Can you relate to us the impressions and judgments you formed based upon your interview with the parents about Eileen?"
* * * * * *
 "Q. Well, can you tell us something about Eileen Carroll based upon your interviews with her and your observations of her? Can you describe her for us, please, ma'am?"
Insanity, or mental competency, may not be proved or disproved by hearsay. Kimbrell v. State, 130 Ala. 40, 30 So. 454 (1901);Howard v. State, 347 So.2d 574, 575 (Ala.Cr.App. 1977), and cases cited. A witness cannot testify directly as to the mental operation of another. Fincher v. State, 211 Ala. 388, 100 So. 657
(1924); Fillman v. State, 41 Ala. App. 175, 127 So.2d 628, cert. denied, 271 Ala. 698, 127 So.2d 632 (1961). A defendant attempting to show insanity by family history has the duty of showing that the evidence was within the exception to the hearsay rule. Jarvis v. State, 220 Ala. 501, 126 So. 127 (1930).
A non expert witness cannot testify to the mental condition of a person until it has been shown that he has an intimate acquaintance with such person and that his association with him is of such a duration as to justify the forming of an opinion.Langston v. State, 16 Ala. App. 123, 75 So. 715 (1917).
 "A lay witness may give his opinion that another was insane or afflicted with an analogous mental defectiveness if, but only if, the witness has first testified: (1) to facts showing that he had an adequate opportunity to observe such other's conduct in general and (2) to his personal observation of specific irrational conduct of such other.
 "It should be emphasized that a lay witness may not testify that it is his opinion that another was insane, no matter how extensive and adequate the witness' opportunity to observe such other's conduct, unless the witness has first testified to his personal knowledge of specific irrational conduct of such other."
McElroy, § 128.02.
Whether a witness has acquired a knowledge beyond that of an ordinary witness so as to qualify him as an expert on a particular subject is within the discretion of the trial court whose ruling thereon will not be disturbed on appeal unless a clear abuse of discretion is shown. Willingham v. State, 261 Ala. 454, 74 So.2d 241 (1954). The competency of a witness, whether expert or not, to give an opinion as to the sanity or insanity of a person rests largely in the discretion of the court. Woods v.State, 186 Ala. 29, 65 So. 342 (1914); Parrish v. State, 139 Ala. 16,36 So. 1012 (1904). "The inference of a witness as to the mental state of another is rejected where it is conceived rather than perceived." Hembree v. State, 20 Ala. App. 181, 184,101 So. 221 (1924). The mere fact that a lay witness has handled a great many insane persons, had observed and studied them and had read *Page 761 
medical works on the subject, does not automatically qualify him to testify as an expert on insanity, the general rule being that only persons licensed by law to practice medicine as a profession can testify as experts on that question. Odom v. State, 174 Ala. 4,56 So. 913 (1911).
The record does not show that this witness was qualified to state her opinion on the mental condition of the appellant at the time of the crime. Since there is no showing that the trial judge abused his discretion in determining the competency of a witness we will not predicate reversible error on the rulings of the trial judge on the above questions.
We have carefully searched the record for error prejudicial to the appellant. In the absence of such error we affirm the judgment of the trial court.
AFFIRMED.
All Judges concur.
[1] The evidence is without conflict that while the appellant was in intensive care she received no drug which would "alter her mental state".
[2] The statement was made in a conversation to a friend after a general discussion in which the appellant evidenced some degree of awareness of her situation and the death of her children. The statement itself contains thoughts similar to and in confirmation of some of the thoughts expressed in the suicide note. There is no evidence that the appellant was under the influence of any medication when the statement was made.
[3] While a person so mentally incapacitated as to be incompetent as a witness will generally be considered to be incompetent to make an admissible confession, Redwine v. State, 258 Ala. 196,61 So.2d 724 (1952); McElroy § 200.14 (1); H. Weihofen MentalDisorders As A Criminal Defense, p. 455 (1954); 23 C.J.S. Criminal Law § 828 (1961), the burden of showing such incapacity rests upon the defendant. Kelso v. State, 40 Ala. App. 627, 628,119 So.2d 916 (1960).